**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-3440
_____

NATIONAL LABOR RELATIONS BOARD,
                                        Petitioner

1199 SEIU UNITED HEALTHCARE WORKERS
EAST, N.J. REGION,
                        Intervenor
v.

NEW VISTA NURSING AND REHABILITATION,
                                        Respondent

_____

Nos. 12-1027 & 12-1936
_____

NEW VISTA NURSING AND REHABILITATION,
LLC,
                                Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
                                        Respondent

1199 SEIU UNITED HEALTHCARE WORKERS
EAST, N.J. REGION,
                              Intervenor
_____

On Application for Enforcement of an Order of the
National Labor Relations Board &
Cross-Petition for Review
(NLRB No. 22-CA-29988)
_____

Argued March 19, 2013

Before: SMITH, GREENAWAY JR, and
VAN ANTWERPEN, *Circuit Judges*
(Filed: May 16, 2013)

Beth S. Brinkmann        [ARGUED]
United States Department of Justice
Civil Division
Room 3135
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Julie B. Broido
Linda Dreeben

National Labor Relations Board
1099 14th Street, N.W.
Washington, DC  20570

Sarang V. Damle
United States Department of Justice
Civil Division
Room 7217
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Scott R. McIntosh
United States Department of Justice
Civil Division
Room 7259
950 Pennsylvania Avenue, N.W
Washington, DC  20530

Melissa N. Patterson
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Milakshmi V. Rajapakse  [ARGUED]
National Labor Relations Board
Appellate and Supreme Court Litigation
Branch, Division of Enforcement
Room 8114

1099 14th Street, N.W.
Washington, DC  20570

Benjamin M. Shultz
United States Department of Justice
Civil Division
Room 7211
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
     *Counsel for Petitioner*

William S. Massey
Gladstein, Reif & Meginniss
817 Broadway
6th Floor
New York, NY  10003
     *Counsel for Intervenor-Petitioner*

Louis J. Capozzi       [ARGUED]
Capozzi & Assoc.
P.O. Box 5866
Harrisburg, PA  17110

Morris Tuchman
2nd floor
134 Lexington Avenue
New York, NY  10016
     *Counsel for Respondent*

Victor Williams
Catholic University of America
School of Law
Faculty Suite 480
3600 John McCormack Road, N.E.
Washington, DC  20064
        *Counsel for Amicus-Petitioner*

————————————

OPINION

————————————

SMITH, *Circuit Judge*.

The Recess Appointments Clause in the Constitution provides that "[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. The central question in this case is the meaning of "the Recess of the Senate," which is the only time in which the president may use his power to recess appoint officers. Three definitions have been offered: (1) breaks between sessions of the Senate (i.e., "intersession breaks"); (2) these intersession breaks as well as breaks within a session (i.e., "intrasession breaks") that last for a non-negligible time, or (3) any break in Senate business that makes the body unavailable to provide advice and consent on the president's nominations. This is a difficult

question that has never been addressed by our Court or the Supreme Court. We hold that "the Recess of the Senate" in the Recess Appointments Clause refers to only intersession breaks. As a consequence, we conclude that the National Labor Relations Board panel below lacked the requisite number of members to exercise the Board's authority because one panel member was invalidly appointed during an intrasession break. We will therefore vacate the Board's orders.

I

New Vista operates a nursing and rehabilitative care center in Newark, New Jersey. On January 25, 2011, a healthcare workers' union petitioned the National Labor Relations Board ("the Board") for certification as the representative for New Vista's licensed practical nurses ("LPN"). New Vista opposed this certification on the grounds that its LPNs are supervisors who cannot unionize under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(3), (11). *See NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 709 (2001) (explaining that supervisors do not fall within the NLRA's definition of a bargaining unit). On March 9, 2011, the Board's regional director determined that New Vista's LPNs were not supervisors and thus certified the union as well as ordered an election. New Vista appealed to the Board, which affirmed the regional director's order.

The union won a majority in the ensuing election. New Vista refused to bargain with the union,[1] which then filed a charge of unfair labor practices against New Vista before the Board. On behalf of the union, the Board's general counsel moved for summary judgment against New Vista, which New Vista opposed. The Board unanimously granted summary judgment in favor of the Union and against New Vista in a "decision and order" dated August 26, 2011.

This order was issued by a three-member "delegee group" of the Board. The NLRA establishes that the Board is composed of up to five members, appointed by the president and confirmed with the advice and consent of the Senate. 29 U.S.C. § 153(a). Section 153(b) authorizes the Board to "delegate to any group of three or more members any or all of the powers which it may itself exercise." *Id*. § 153(b). These delegee groups must

---

[1] Refusal to bargain is a common way to obtain judicial review of representation determinations like the Board's affirmation of the regional director's March 9, 2011 decision for which direct review is unavailable. *NLRB v. Kentucky River Cmty. Care Inc.*, 532 U.S. at 709 (explaining that "direct judicial review of representation determinations is unavailable" but that indirect review may be obtained by refusing to bargain and thereby inducing the Board to file an unfair labor practice claim (citing *AFL v. NLRB*, 308 U.S. 401, 409–11 (1940)).

"maintain a membership of three in order to exercise the delegated authority of the Board." *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2644 (2010).

Importantly, this three-member-composition requirement is distinct from § 153(b)'s quorum requirements. The quorum requirements speak to the number of members who must be present to exercise the Board's powers for either the Board itself or a properly constituted three-member (or more) delegee group. *See id.* at 2642–43 (explaining that the "group quorum provision" "authorizes two members to act as a . . . group of at least three members" but does not "authorize two members to constitute a valid delegee group"); *see also id.* at 2642 (defining quorum as "the number of members of a larger body that must participate for the valid transaction of business"). To have a quorum, a delegee group must have at least two of its three members present and the Board must have at least three of its five members present. 29 U.S.C. § 153(b).

In contrast, the three-member-composition requirement speaks to how many members are required for a delegee group to be a properly constituted body that can exercise the Board's powers. These different requirements are certainly related, but this case simply turns on whether the delegee group that issued the August 26 Order and the subsequent reconsideration orders had three members.

8

On September 7, 2011, New Vista filed a motion with the Board to reconsider the August 26 Order. The company argued that the three-member delegee group acted *ultra vires* because although the order is dated August 26—one day before one member, Wilma Liebman, resigned—it was not issued until it was mailed during the week of August 29. This would mean, according to New Vista, that the panel had only two members when the order was issued, thereby violating 29 U.S.C.  § 153(d)'s  three-member-composition requirement. The company also argued that the August 26 Order was substantively incorrect. Meanwhile, on September 13, 2011, the Board filed with this Court an application for enforcement of the August 26 Order. We granted an uncontested motion to hold in abeyance the filing of the administrative record pending resolution of the motion for reconsideration. This functionally acted as a stay of the proceedings before us.

On December 30, 2011, the Board denied New Vista's motion for reconsideration. New Vista took two actions. First, it filed a second motion for reconsideration on January 3, 2012. In this motion, the company argued that the three-member December 30 delegee group was improperly constituted and thus without power to issue the order because one of the panelists was recused from the case. The company also argued in a March 14 "further motion for reconsideration" that the December 30 Reconsideration Order delegee group was improperly

constituted because one of the panelists was a recess appointee whose term concluded at the end of the Senate's 2011 session—which New Vista contended was December 17, 2007, thirteen days before the December 30 Reconsideration Order was issued.

Second, on January 9, 2012, New Vista filed a petition for review of the December 30 Reconsideration Order with this Court. We have treated this petition as a cross-petition for review opposing the Board's petition for enforcement of the August 26 Order. We also granted another Board motion to hold in abeyance the filing of the administrative record for these petitions until New Vista's second motion for reconsideration was resolved. This, again, functionally acted as a stay of the proceedings before us.

On March 15, 2012, the Board denied New Vista's second motion for reconsideration. This order did not address the company's March 14 argument that the term of one panelist had ended on December 17. On March 22, 2012, New Vista filed a third motion for reconsideration. This motion reiterated the company's March 14 argument that the December 30 delegee group was improperly constituted because the Senate's session had ended on December 17. The motion also argued that the three-member delegee group that issued the March 15 Reconsideration Order lacked three members because two of its members were invalidly appointed to the Board under the Recess Appointments Clause while the Senate

was not in "recess." In sum, New Vista argued that if the Senate's session had ended when it began using *pro forma* sessions, then the December 30 panel had only two members because the term of one of its members expired. But if the Senate's session did not end at that time, then the March 15 panel was improperly constituted because the president's recess appointments were invalidly made while the Senate was not in recess. The Board denied this motion on March 27, 2012. The Board also filed the administrative record with this Court on that date, thereby stripping itself of jurisdiction. *See* 29 U.S.C. § 160(e) ("Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final.").

On April 4, 2012, New Vista filed a petition for review of the March 15 and March 27 Reconsideration Orders. We granted New Vista's request that this petition be consolidated with New Vista's earlier petition for review for all purposes. These consolidated petitions for review are collectively a cross petition opposing the Board's petition for enforcement of the August 26 Order.

## II

We consider *sua sponte* whether the delegee group that issued the August 26 Order had jurisdiction. *See Bender v. Williamsport Area Sch. Bd.*, 475 U.S. 534, 541 (1986) (explaining that "every federal appellate court has a special obligation to 'satisfy itself not only of its own

jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it" (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934))). In their initial briefs, the parties contended that the delegee group had subject-matter jurisdiction under 29 U.S.C. § 160(a), which "empower[s]" the Board (and its three-member delegee groups) "to prevent any person from engaging in any unfair labor practice . . . affecting commerce." We do not doubt that § 160(a) provides one jurisdictional requirement for the Board to adjudicate a case. But that does not preclude others. We have thus inquired whether 29 U.S.C. § 153(b)'s three-member-composition requirement is jurisdictional. We hold that it is.

This Court has previously explained that "the overall authority of the Board to hear [a] case under the NLRA" is a jurisdictional question that "'may be raised at any time.'" *NLRB v. Konig*, 79 F.3d 354, 360 (3d Cir. 1996) (quoting *NLRB v. Peyton Fritton Stores, Inc.*, 336 F.2d 769, 770 (10th Cir. 1964)); *see also Polynesian Cultural Center, Inc. v. NLRB*, 582 F.2d 467, 472 (9th Cir. 1978). Under § 153(b) and *New Process Steel*, delegee groups of the Board do not have statutory authority to act if they have fewer than three members. *New Process Steel*, 130 S. Ct. at 2644; *Teamsters Local Union No. 523 v. NLRB*, 624 F.3d 1321, 1322 (10th Cir. 2010) (holding that a "two-member NLRB group that issued the order in this case *lacked statutory authority to*

12

*act*" (emphasis added)). The three-member-composition requirement is thus jurisdictional because it goes to the Board's authority "to hear [a] case under the NLRA." *Konig*, 79 F.3d at 360.

Nevertheless, the Supreme Court "has endeavored in recent years to 'bring some discipline' to the use of the term 'jurisdictional.'" *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) (quoting *Henderson v. Shinseki*, 131 S. Ct. 1197, 1202–03 (2011)). So there may be reason to believe that *Konig*'s analysis and the subsequent jurisdictional conclusion for this case are no longer valid. *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, 538 F.3d 241, 249 n.16 (3d Cir. 2008) (explaining that "[a]n intervening decision of the Supreme Court is a sufficient basis for us to overrule a prior panel's opinion without referring the case for an en banc decision"). Our review of the Court's recent clarification shows that *Konig* remains good law and that the three-member-composition requirement is jurisdictional. The Court has explained that jurisdiction "refers to a court's adjudicatory authority." *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243 (2010) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)). Subject-matter jurisdiction "refers to 'the courts' statutory or constitutional *power* to adjudicate the case.'" *Id.* (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original)).

13

Although these statements refer to Article III courts, jurisdictional issues are just as important for administrative adjudicative bodies. "It is well settled that an administrative agency," like an Article III court, "is a tribunal of limited jurisdiction." *Pentheny Ltd. v. Gov't of Virgin Islands*, 360 F.2d 786, 790 (3d Cir. 1966). An administrative agency "may exercise only the powers granted by the statute reposing power in it." *Id.*; *see also* 2 Am. Jur. 2d *Administrative Law* § 282 (2013) ("Administrative agencies are tribunals of limited jurisdiction . . . . As a general rule, agencies have only such adjudicatory jurisdiction as is conferred on them by statute."). These powers are limited by the scope of the jurisdictional statute in the same way that a federal court's powers are limited by the Constitution and statute. *Compare* 2 Am. Jur. 2d *Administrative Law* § 282, *with Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) ("The district courts of the United States, as we have said many times, are 'courts of limited jurisdiction. They possess only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). The fact that this case deals with an administrative agency does not eliminate the requirement that a delegee group satisfy all jurisdictional requirements before it may exercise the Board's powers.

In *Henderson v. Shinseki*, the Supreme Court stated that "a rule should not be referred to as

14

jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." 131 S. Ct. at 1202. As noted, subject-matter jurisdiction is "statutory or constitutional *power* to adjudicate the case." *Steel Co.*, 523 U.S. at 89 (emphasis in original). Furthermore, in *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), the Supreme Court provided a "readily administrable bright line" rule: "If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." *Id.* at 515–16. "But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.* at 516. "Congress, of course, need not use magic words in order to speak clearly on this point," so context can show that a requirement is jurisdictional. *Henderson*, 131 S. Ct. at 1203.

The Supreme Court's recent decision in *New Process Steel* indicates that § 153(b)'s three-member-composition requirement is jurisdictional. In that case, the Board had delegated its power to a three-member delegee group. Three days after the delegation became effective, the term expired for one of the three members of the delegated group. This left the group with only two members. 130 S. Ct. at 2638–39. The Supreme Court held that § 153(b)'s three-member-composition requirement meant that the "two remaining Board

15

members cannot exercise" the authority of the Board. *Id.* at 2638, 2644 ("We thus hold that the delegation clause requires that a delegee group maintain a membership of three in order to exercise the delegated authority of the Board."). The presence of three Board members in a delegee group is a necessary condition for the Board to exercise its power to adjudicate a matter before it.

*New Process Steel* renders the three-member-composition requirement "a threshold limitation" on the scope of the power delegated to the Board by the NLRA: the Board cannot exercise its power through a delegee group if that group has fewer than three members. This statutory mandate is therefore jurisdictional. *See Arbaugh*, 546 U.S. at 515 (explaining that "threshold limitation[s] on a statute's scope" imposed by Congress are jurisdictional); *Teamsters Local Union No. 523*, 624 F.3d at 1322 (holding that a "two-member NLRB group that issued the order in this case *lacked statutory authority to act*" (emphasis added)). By explaining that three members are required "in order to exercise the delegated authority of the Board," *New Process Steel*, 130 S. Ct. at 2644, the Supreme Court has in essence declared that the three-member-composition requirement goes directly to the board's "power to hear a case," which is exactly what jurisdictional questions relate to. *United States v. Cotton*, 535 U.S. 625, 630 (2002); *see also Noel Canning v. NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013) ("[T]he objections before us concerning lack of a quorum

16

raise questions that go to the very power of the Board to act.").[2]

The Board relies on three cases[3] as authority providing that "a claim that a federal officer was

[2] The D.C. Circuit appears to have conflated the quorum requirement with the three-member-composition requirement. *See generally Noel Canning*, 705 F.3d at 490 (discussing challenge as one based on the quorum requirement); *id*. at 499 (stating that *New Process Steel* "holds that the Board cannot act without a quorum of three members" and "[i]t is undisputed that the Board must have a quorum of three in order to take action"). Notwithstanding the semantics, the substance of the D.C. Circuit's conclusion was that when less than three members purport to exercise the adjudicative authority of the Board, it "raise[s] questions that go to the very power of the Board to act." *Id*. at 497. We agree.

[3] The Board also argues that *Vermont Agency of Natural Resources v. United States*, 529 U.S. 765 (2000), describes the Appointments Clause as nonjurisdictional. *Id*. at 778 n.8. That case, however, states no such thing. Instead, it illustrates the very point we make here. It describes the question *in which the appointments issue arose*, rather than the Appointments Clause itself, as nonjurisdictional. *Id*. (stating that "the validity of *qui tam* suits" is not "a jurisdictional issue"). And because that question was nonjurisdictional, the appointments issue

17

appointed unconstitutionally is *not* a jurisdictional challenge." NLRB Ltr. Br. at 2 (Feb. 28, 2013) (citing *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1991); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748 (D.C. Cir. 2009); *Evans v. Stephens*, 387 F.3d 1220 (11th Cir. 2004) (en banc) (emphasis in original). These cases hold that Appointments Clause challenges are nonjurisdictional when brought independently. *Freytag*, 501 U.S. at 878–79; *Intercollegiate Broad. Sys.*, 574 F.3d at 755–56; *Evans*, 387 F.3d at 1222 n.1. Those holdings are not relevant to the jurisdictional conclusion we reach today. We do not hold that challenges under the Appointments or Recess Appointments Clauses are jurisdictional. We instead hold that the NLRA's *three-member-composition requirement* is jurisdictional and must be met before the Board can exercise its power over a case. Because this requirement is jurisdictional, any reason for which the delegee group consists of fewer than three members— including whether one member is invalidly appointed

---

within the question was not treated as jurisdictional. *See id*. Our conclusion in relation to the three-member-composition requirement for delegee groups is the opposite: it is jurisdictional. Accordingly, the appointments issue here must be treated as jurisdictional because it is one reason that there may not have been three members.

under the Recess Appointments Clause—can be raised by a party or by this Court at any point in litigation as a jurisdictional defect. *See Henderson*, 131 S. Ct. at 1202.

The jurisdictional nature of the three-member-composition requirement is especially important in this case because it requires us to analyze whether Craig Becker—one of the three-member delegee group that decided the August 26 Order—held a valid appointment under the Recess Appointments Clause. This question is distinct from the recess-appointments question initially briefed by the parties. The parties' briefs address whether Richard Griffin and Sharon Block—who were members of the delegee group that decided the March 15 and March 27 Reconsideration Orders—were invalidly recess appointed because their January 9, 2012 appointments were made while the Senate was holding so-called *pro forma* sessions.[4] Member Becker was not appointed when the Senate was holding *pro forma* sessions but, instead, was appointed on March 27, 2010, one day after the Senate "adjourn[ed]" for two weeks. 156 Cong. Rec. S2180 (daily ed. Mar. 26, 2010) (statement of Sen. Kaufman) (reporting Senator Ted Kaufman's motion for and the Senate's unanimous consent of the body being "adjourned until Monday April 12, 2010 at 2 p.m."). As will be seen in Part V, this means that our consideration

---

[4] The characteristics of *pro forma* sessions are described in Part V.

19

of Member Becker's appointment entails evaluation of at least one more definition of "recess" than the evaluation of Members Griffin and Block's appointments. Before delving into the difficult constitutional task of defining "recess," however, we must first address two preliminary questions: whether the delegee group that issued the August 26 Order lacked three members as a result of Chairman Liebman's resignation and whether the definition of recess is a nonjusticiable political question.

## III

"We have a longstanding practice of avoiding constitutional questions in cases where we can reach a decision upon other grounds." *Egolf v. Witmer*, 526 F.3d 104, 109 (3d Cir. 2008). That practice leads us first to consider New Vista's  nonconstitutional argument that the August 26 Order was issued by a delegee group of fewer than three members. New Vista contends that one of the three members resigned before the order was issued. The delegee group that issued the order consisted of Chairman Liebman, Member Becker, and Member Hayes. The face of the order is dated August 26, 2011. *New Vista Nursing & Rehab.*, 367 N.L.R.B. No. 69 (Aug. 26, 2011). The Board docket also reflects August 26, 2011 as the date that the order was issued. *New Vista Nursing & Rehab.*, NLRB No. 22-CA-029988 (Aug. 26, 2011), http://www.nlrb.gov/case/22-CA-029988.  On August 27, Chairman Liebman resigned. New Vista argues that the order was actually entered after Liebman

20

resigned because the order "was mailed, received by the Regional Board Agent, and was posted on the Board's Summary of Decisions Website on August 31, 2012." Pet'r's Br. at 31. The Board does not dispute that the order was mailed to interested parties after August 27 but contends that the order was issued on August 26—the date that appears on the face of the order.

"Agency action is entitled to a presumption of regularity." *Frisby v. U.S. Dep't of Hous. & Urban Dev.*, 755 F.2d 1052, 1055 (3d Cir. 1985). "Acts done by a public officer which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter." *R.H. Stearns Co. of Boston, Mass. v. United States*, 291 U.S. 54, 63 (1934). Here, the act done was the issuance of the August 26 Order, which presupposes that the members listed as having made the decision did in fact make that decision. The issuance of the order creates a presumption that all three members listed on the order decided it. *See id*. It is New Vista's burden to rebut that presumption.

New Vista offers only a single piece of evidence in rebuttal: that the order was not mailed until after August 26. This is insufficient, and *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453 (D.C. Cir. 1967), demonstrates why that is so. In that case, Braniff Airways argued that the Civil Aeronautics Board lacked a quorum because one of its members had resigned before the order was issued. *Id*. at 459. The order in that case was issued

on June 1, the same day the member in question resigned. The Court found that the Board had a quorum solely on the basis that the order "on its face indicated that it was concurred in and signed on June 1, 1965." *Id.* The Court reached that conclusion despite payroll records with conflicting accounts, one of which showed that the member was on the payroll only through May 31, 1965. *Id.* Notably, the Court also discounted that the order "was not served until June 2," on the basis that "[i]n [their] view it is plain that once all members have voted on an award and caused it to be issued the order is not nullified because of incapacity, *intervening before the ministerial act of service,* of a member needed for a quorum." *Id.* (emphasis added).

The D.C. Circuit's reasoning is equally persuasive here. The only evidence New Vista puts forth is that the order was mailed after it was dated and posted on the docket. This falls short even of what Braniff Airways presented. It relied not only on a delay in service but also on payroll records. New Vista presents even weaker grounds to doubt the order's date than Braniff offered the D.C. Circuit. New Vista cannot overcome the presumption of regularity.

New Vista also argues that it is entitled to seek further discovery into when the members voted on the August 26 Order. The company acknowledges, however, that "the NLRB may not be required to enter for the record the time, place, and content of their deliberations,"

Pet'r's Br. at 53, and the Board has stated that the minutes sought do not exist, Resp. Br. at 29. Yet New Vista persists, asserting "that the record of the time of their votes on agency actions under review is essential to determine" the validity of the August 26 Order. Pet'r's Br. at 53. The company fails to explain why the date listed on the order itself is not evidence "of the time of their vote." Absent a reason to doubt the date listed, the presumption of regularity requires that we consider the date as the record of when the delegee group caused the opinion to be issued, which presupposes that they voted on or before that date. Accordingly, New Vista has failed to show that one of the members resigned prior to the issuance of the August 26 Order.

IV

The *amicus* argues that we should decline to define the word "recess" within the Recess Appointments Clause because it is a nonjusticiable political question. "Questions of justiciability are distinct from questions of jurisdiction, and a court with jurisdiction over a claim should nonetheless decline to adjudicate it if it is not justiciable." *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 376 (3d Cir. 2006) (citing *Baker v. Carr*, 396 U.S. 186, 198 (1962)). An issue presents a nonjusticiable political question when one of the following characteristics is "inextricable from the case":

23

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. *Amicus*'s principal contentions are that the recess-appointments claim by New Vista is nonjusticiable because (1) "'the issue is textually committed' to the president," *Amicus* Br. at 4 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)), and (2) there are "no 'manageable standards' to solve the partisan argument between the Executive and Congress . . . regarding dysfunctional Senate confirmation processes," *id*.[5] Neither argument is persuasive.

---

[5] The *amicus* also briefly refers to two other bases for concluding this is a political question: that (1) resolving

Nothing in the language of the Recess Appointments Clause textually commits to the president

---

the issue is impossible "'without expressing lack of the respect due coordinate branches of government,'" *id.* at 5 (quoting *Baker*, 369 U.S. at 217), and (2) "the nation's *extreme* need for *finality* in the president's recess appointment practice," *id.* (emphasis in original). Neither is persuasive. Defining recess in the Recess Appointments Clause does not express a lack of respect for coordinate branches of government because defining the word is merely an exercise of our judicial authority "to say what the law is," which sometimes requires an evaluation of whether one branch is aggrandizing its power at another's expense. *See Zivotosky v. Clinton*, 132 S. Ct. 1421, 1427–28 (2012); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982) (explaining, when discussing appropriate exercise of judicial review of executive action, that "[w]hen judicial action is needed to serve broad public interest—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . the exercise of jurisdiction has been warranted" (citations omitted)). Nor is the constitutionality of the president's recess-appointments practice the type of question implicating an extreme need for finality that would make it nonjusticiable. *Cf. Baker*, 369 U.S. at 213 (discussing the need for finality in the context of the president's war power to end a conflict).

25

the task of defining "recess." The Clause states that "[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. This language lacks the explicit assignment of power to any one branch, such as the assignment found in the Constitution's Impeachment Trial Clause which states that "[t]he Senate shall have the *sole* Power to try all Impeachments." U.S. Const. art. I, § 3, cl. 6 (emphasis added); *Nixon*, 506 U.S. at 228–35 (concluding that the explicit assignment, along with drafting history indicating that the assignment was intentional, meant that the power to try impeachments was textually committed to the Senate). The Recess Appointments Clause also does not contain an imperative to either branch to craft a rule regarding the meaning of recess—or, more broadly, when the president may use his recess appointments power. The Clause is thus also distinguishable from the Naturalization Clause's grant to Congress of the authority to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4; *New Jersey v. United States*, 91 F.3d 463, 469 (3d Cir. 1996) (stating that this Clause represents a textual commitment to Congress).[6]

---

[6] Even Congress' plenary authority over immigration and naturalization does not render its actions in this area immune from judicial review under the political-question

Finally, the Clause does not provide unqualified power to either the Senate or the president that would suggest it makes a textual commitment to either. It limits the president's recess-appointment power by requiring that the Senate be in recess, and it limits the Senate's ordinary advice-and-consent power by eliminating that power while the Senate is in recess. The Clause thus cannot be read to invariably favor one branch's interests in such a way that it makes a textual commitment to one of them. *See Freytag*, 501 U.S. at 880 ("Because it articulates a limiting principle, the Appointments Clause does not always serve the Executive's interests."); *Ryder v. United States*, 515 U.S. 177, 182 (1995) ("The [Appointments] Clause is a bulwark against one branch aggrandizing its power at the expense of another branch, but it is more: it 'preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power.'" (quoting *Freytag*,

doctrine. In *INS v. Chadha*, for example, the Supreme Court held that Congress' plenary authority over immigration did not render any challenge to that authority to be a nonjusticiable political question. 462 U.S. 919, 940–41 (1983). The Court explained that "[t]he plenary authority of Congress over aliens . . . is not open to question" except when it is alleged that the means chosen "'offend[s] some other constitutional restriction'" on Congress. *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976)).

501 U.S. at 878)); The Federalist No. 76 (Alexander Hamilton) (explaining the Constitution's rejection of unitary power in either the president or the Senate in favor of one that divides power between them).

The *amicus* disputes this, arguing that the Clause makes a textual commitment by providing the president "unilateral appointment authority when the Senate [is] unavailable to render its advisory consent vote." *Amicus* Br. at 12. This argument reveals the tendency of the political-question doctrine "to obscure the need for case by case inquiry." *Gross*, 456 F.3d at 377–78 (quoting *Baker*, 369 U.S. at 210–11). We have cautioned against this tendency, instructing that our inquiry must "avoid 'resolution by any semantic cataloguing,'" and must instead "undertake a 'discriminating inquiry into the precise facts and posture of the particular case.'" *Id.* (quoting *Baker*, 369 U.S. at 217). The *amicus*'s argument runs afoul of our instruction because it merges the issue present in this case (when the president can use his recess-appointments power) with an issue not in this case (how the president can use that power). The *amicus*'s characterization of the power speaks to both issues: it states how the president can use his recess-appointment power ("unilateral authority") and assumes the answer to the question in this case of when he can use that power ("when the Senate [is] unavailable to render its advisory consent vote"). The greater power the president has during a recess does not shed light on what the word

28

"recess" means or who decides what it does mean and thus does not provide a reason to conclude that the Clause makes a textual commitment to the president. *Cf. INS v. Chadha*, 462 U.S. 919, 940–41 (1983) (explaining that Congress' plenary authority over immigration does not immunize it from judicial review for violations of other constitutional restrictions on its power committed while exercising that authority).

The *amicus*'s concerns regarding the lack of judicially manageable standards for defining "the Recess of the Senate" are similarly unfounded. There are several judicially manageable standards for defining "the Recess of the Senate" and, correspondingly, for when the president may use his recess-appointments power. The parties present two different standards: according to New Vista, any time after both houses have agreed to adjourn for more than three days, Pet'r's Br. at 40–41, and according to the Board, any time the Senate is not available to conduct regular business, Resp. Br. at 44. *Cf. Zivotofsky*, 132 S. Ct. at 1428–30 (relying on the "detailed legal arguments" provided by the parties regarding whether the statute at issue was constitutional to show the existence of judicially manageable standards). The D.C. Circuit has provided another: intersession breaks that follow adjournments *sine die* of the Senate. *Noel Canning*, 705 F.3d at 506–07. Of these standards, those provided by the D.C. Circuit and New Vista are judicially manageable because they rely on

29

regular procedures employed in the Senate and found in the Senate's record. The Board's more open-ended definition of recess might very well be unmanageable because it does not rely on any particular Senate procedure and would require judicial "explor[ation] [of] communications between the Senate Minority and the president" in addition to review of the "scheduling schemes of the Senate Minority and House Majority." *Amicus* Br. at 20–24 (arguing, after rejecting the standard offered by New Vista, that the Board's standard is unmanageable). But this only cautions against selecting the Board's standard rather than showing that there are no judicially manageable standards available.

Of course, if the question is framed—as the *amicus* has—as a need to derive a judicially manageable standard "to resolve [ ] the underlying cycles of partisan confirmation obstruction payback which caused the NLRB vacancies," *Amicus* Br. at 25, then there is likely no judicially manageable standard. *See also Evans*, 387 F.3d at 1227 (rejecting as nonjusticiable an argument that the president unconstitutionally used the recess-appointment power because the appointee had been previously rejected by the Senate and thus constituted a circumvention of the Senate's advice and consent role). But that is not the question we face. Instead, we must define the phrase "the Recess of the Senate," which is a question distinct from resolving the "cycles of partisan confirmation obstruction payback." *See id.* at 1224–26,

30

1227 (defining recess to include intrasession breaks despite holding that the political argument made was nonjusticiable).

This task falls within the "'province and duty of the judicial department to say what the law is.'" *Zivotosky*, 132 S. Ct. at 1427–28 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). This "duty will sometimes involve the '[r]esolution of litigation challenging the constitutional authority of one of the three branches,' but courts cannot avoid their responsibility merely 'because the issues have political implications.'" *Id.* at 1428 (quoting *Chadha*, 462 U.S. at 943) (alteration in original). Thus, "the fact that the resolution of the merits of a case would have 'significant political overtones does not automatically invoke the political question doctrine.'" *Khouzam v. Att'y Gen.*, 549 F.3d 235, 249–50 (3d Cir. 2008) (quoting *Chadha*, 462 U.S. at 942–43). That the issue presented here touches on political events of the day is not dispositive of whether this case presents a nonjusticiable question. Because there are manageable standards and because the Clause does not make a textual commitment to the Senate or the president, we hold that interpreting the phrase "the Recess of the Senate" is a justiciable question.

V

Having determined that the Recess Appointments question is justiciable, we now begin our analysis of the

recess-appointment issue. Member Becker is the only member of the delegee group that issued the August 26 Order who was recess appointed and thus the only one whose appointment is in question. As noted, he was appointed during an intrasession break that began on March 26, 2010, and ended on April 12, 2010. This break lasted seventeen days and the Senate was indisputably not open for business. His appointment will be invalid if the Recess Appointments Clause does not empower presidents to make recess appointments during these types of breaks.

The Clause provides that "[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. This is understood to allow the president to use his recess appointment power only "during the Recess of the Senate," thereby rendering the definition of recess, along with its temporal reach, of pivotal consequence to the controversy now before us. *See Noel Canning*, 705 F.3d at 499–500; *Evans*, 387 F.3d at 1224. Three possible definitions have been presented. The D.C. Circuit defines the term to mean only intersession breaks, which are "the period between sessions of the Senate when the Senate is by definition not in session and therefore unavailable." *Noel Canning*, 705 F.3d at 499–500, 506. The end of a session is typically demarcated by a particular type of Senate

adjournment—an adjournment *sine die*—which is the procedure used to end a Senate session. *Id.* at 512–13.[7] An intersession break is the period between an adjournment *sine die* and the start of the next session. David H. Carpenter et al., Cong. Research Serv., R42323, *President Obama's January 4, 2012, Recess Appointments: Legal Issues* 4 n.23 (2012).

A second definition, one which the Eleventh Circuit has adopted, is that recess includes intersession breaks *as well as* some "intrasession" breaks, which are breaks in Senate business during a session. *Evans*, 387 F.3d at 1224. An intrasession break is demarked by a Senate adjournment of any type—other than adjournment *sine die*—and lasts until the next time the Senate convenes, which is set by the motion to adjourn. *See, e.g.*, Cong. Rec. S2180 (daily ed. Mar. 26, 2010)

---

[7] Senate practice also ends sessions automatically through its understanding of the Constitution's requirement that they "shall assemble at least once in every year" in a meeting that begins "at noon on the 3d day of January." U.S. Const. Amend. XX. Under this practice, if a session of Congress has not ended by noon on January 3 of a given year, then the session automatically ends and another begins at noon of that day. *See* Thomas Jefferson, *A Manual of Parliamentary Practice: For the Use of the Senate of the United States* 166 (2d ed. 1812).

(statement of Sen. Kaufman) (reporting Senator Kaufman's March 26, 2010 motion for and the Senate's unanimous consent of the body being "adjourned until Monday April 12, 2010 at 2 p.m."). From 1921 until recently, there was a consensus that an intrasession break was not "the Recess of the Senate" unless the break lasted for a non-negligible number of days. The first attorney general to adopt this view suggested that the minimum duration was ten days. 33 U.S. Op. Att'y Gen. 20, 24–25 (1921) (rejecting the proposition that "an adjournment for 5 or even 10 days can be said to constitute the recess intended by the Constitution," but advising the president that a break of 28 days is within the meaning of recess). All presidents, at least in practice, followed this ten-day minimum until January 2012. Carpenter et al., *supra*, at 15 & n.97 (stating that no presidents until 2012 made a recess appointment during an intrasession break shorter than ten days). Accordingly, the second definition includes only those intrasession breaks that last for a significant duration, which historically has been ten days or more.[8]

---

[8] Others have argued that a three-day break is sufficient to constitute "the Recess of the Senate." *See, e.g.*, Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 419–21 (2005). This number is drawn from the Adjournments Clause, which requires the Senate and the

The third and final possible definition is of more recent vintage. In January 2012, President Barack Obama made several recess appointments while the Senate was holding *pro forma* sessions every three or four days. These sessions are considered recesses under the third definition. *Pro forma* sessions are formal meetings of the Senate in which usually only one Senator is present to convene the body briefly before adjourning it until the next *pro forma* session. *Id.* at 2; *see also, e.g.*, 157 Cong. Rec. S8787 (daily ed. Dec. 20, 2011) (statement of Sen. Warner) (recording Senator Mark Warner's convening and adjournment of the Senate in a span of thirty-five seconds). Before such sessions are held, the Senate agrees by unanimous consent that there will be "no business conducted" except business that was previously agreed to, such as convening a new session of the Senate. *See, e.g.*, 157 Cong. Rec. S8783–84 (daily ed. Dec. 17, 2011) (statement of Sen. Wyden) (recording the schedule of *pro forma* sessions to be held between December 17, 2011 and January 23, 2012). However, these consent agreements can, and have been, subsequently altered to allow initially unplanned business—including the passing of legislation—during a *pro forma* session. *See, e.g.*, 157

House to concur on any adjournment lasting longer than three days. U.S. Const. art. I, § 5, cl. 4. The argument is that any intrasession break of less than three days is *de minimis* and thus not adequate to constitute "the Recess of the Senate." Hartnett, *supra*, at 419–20.

35

Cong. Rec. S8789 (daily ed. Dec. 23, 2011) (statement of Sen. Reid) (obtaining unanimous consent that a bill "be considered read three times and passed" if an identical version is passed by the House, which the House subsequently did, during a *pro forma* session); *see also* Carpenter et al., *supra*, at 18 & n.108. Importantly, these sessions prevent the Senate from being adjourned for more than three or four days at a time, which means the adjournment never reaches the ten-day minimum discussed above. *See, e.g.*, 157 Cong. Rec. S8784 (daily ed. Dec. 17, 2011) (statement of Sen. Wyden) (recording Senator Ron Wyden's motion, and the Senate's unanimous concurrence therewith, that the Senate be "adjourned until Tuesday, December 20, 2011, at 11 a.m."); 157 Cong. Rec. S8787 (daily ed. Dec. 20, 2011) (statement of Sen. Warner) (recording the Senate's adjournment "until Friday, December 23, 2011, at 9:30 a.m.").

The third definition of recess, which is offered by the Board, allows the president to make recess appointments while the Senate is holding these *pro forma* sessions. The Board argues that a recess occurs when "the Senate is not open to conduct business" and thus unavailable to "provid[e] advice and consent on nominations." Resp. Br. at 44. The Board argues that this definition follows from Attorney General Harry Daugherty's 1921 opinion, which adopted a partially functionalist definition of "the Recess of the Senate":

36

> [T]he essential inquiry, it seems to me, is this: Is the adjournment of such duration that the members of the Senate owe no duty of attendance? Is its chamber empty? Is the Senate absent so that it can not [sic] receive communications from the President or participate as a body in making appointments?

33 U.S. Op. Att'y Gen. at 25. The Board contends that these criteria decide whether the Senate is open to conduct business and available to provide its advice and consent. Unlike Attorney General Daugherty's opinion, the Board appears to consider these criteria controlling in themselves, such that there is no requirement for a minimum, non-negligible period of time to pass in order for the Senate to be in recess.[9] *Id.*

---

[9] The Board does note that if *pro forma* sessions are ignored, then more than ten days passed during the break in which the president recess appointed two Board members who sat on the March 15 and 27 delegee group. Resp. Br. at 46 (noting that twenty days passed between when the second session of the Senate was convened on January 3, 2012 and when the Senate held its first non–*pro forma* session). This might suggest that the Board believes a period of time greater than ten days between non–*pro forma* sessions is still required, but such a contention is absent from its briefs and was not suggested

Based on these criteria, the Board contends that periods in which the Senate holds *pro forma* sessions only constitute a recess. This is because during these sessions, the body is neither doing business nor available to provide its advice and consent. This means, per the third definition, that these sessions do not interrupt what would otherwise be an intrasession break that begins with the adjournment before the first *pro forma* session and lasts until the next convening of the Senate in a non–*pro forma* session.

In sum, the parties argue that "the Recess of the Senate" has one of three meanings: (1) intersession breaks; (2) intersession and intrasession breaks that last a non-negligible period, which has historically been ten days ("long intrasession breaks" hereinafter); or (3) any time in which the Senate is not open for business and is

---

at oral arguments when asked for limiting principles to its definition. Resp. Br. at 43–45 (defining recess in only functionalist terms), 58 (rejecting the relevance of a three-day requirement derived from the Adjournment Clause because nothing shows that it is related to the Recess Appointments Clause); Oral Arg. Tr. at 48:11 to 50:1 (explaining that "unavailability of the Senate to provide advice and consent" is the limiting principle on the functionalist definition of recess).

unavailable to provide its advice and consent.[10] We hold

---

[10] We disagree with the dissent that the second and third definitions of recess should be combined into one "intrasession recess" definition. Dissenting Op. at 1–2. Distinguishing between these definitions provides necessary nuance to the analysis. First, as has been discussed, these two definitions have starkly different historical pedigrees: Until 2012, presidents and their attorneys general have always tied intrasession breaks to a non-negligible period of time. *See, e.g.*, 33 U.S. Op. Att'y Gen. at 25. In fact, the Office of Legal Counsel's 2012 memorandum on President Obama's recess appointments during *pro forma* sessions begins by emphasizing that the period between the non–*pro forma* sessions was of sufficient length to be a recess. 36 Op. O.L.C. *4–9 (Jan. 6, 2012). The availability-based definitions of recess that reject any need for a fixed number of days to pass thus represent a significant departure from past practice. Combining the unavailable-for-business definition with the long-intrasession-break definition glosses over important historical differences between the two.

Second, as will be shown, the unavailable-for-business definition has significantly less support than the long-intrasession-break definition from the historical meaning of "recess" as well as the purpose of the Recess Appointments Clause. Accordingly, we reject each definition for somewhat different reasons.

that "the Recess of the Senate" means only intersession breaks, and so we conclude that Member Becker's appointment was invalid.

A.     "[T]he Recess of the Senate"

1. The Literal Meaning of Recess

When interpreting the Constitution, "we begin with its text." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). In doing so, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). The "[n]ormal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Id*. at 576–77.

The word "recess" lacks a natural meaning that clearly identifies whether it includes only intersession breaks or also includes intrasession breaks, whether they be of a certain duration or a period of unavailability. Dictionaries from the time of ratification provide definitions that can be read to support any of these definitions. Samuel Johnson's dictionary defines recess to mean "[r]etirement; retreat; withdrawing; secession" as well as "[d]eparture" and "[r]emoval to distance."

Samuel Johnson, 2 *A Dictionary of the English Language* 469 (6th ed. 1785).[11] All of these definitions contain some connotation of permanence or, at least, longevity. "Secession," for example, means "[t]he act of departing" or "[t]he act of withdrawing from councils or actions." *Id.* at 589; *see also Merriam-Webster's Collegiate Dictionary* 1121 (11th ed. 2003) (defining "secession" to mean "formal withdrawal from an organization"). And "departure" is defined by Johnson to mean "[a] going away," the "[d]eath; . . . the act of leaving the present state of existence," and "an abandoning." Samuel Johnson, 1 *A Dictionary of the English Language* 568 (6th ed. 1785); *see also Merriam-Webster's* at 334 (defining "departure" to mean "the act or an instance of departing," "a setting out (on a new course)"); 1 William Blackstone, *Commentaries* *187–88 (defining one method of terminating parliamentary business, the

---

[11] The entire definition found in Johnson's dictionary is:

> 1. Retirement; retreat; withdrawing; secession. 2. Departure. 3. Place of retirement; place of secrecy; private abode. 4. Perhaps an abstract of the proceedings of an imperial diet. 5. Departure into privacy. 6. Remission or suspension of any procedure. 7. Removal to distance. 8. Privacy; secrecy of abode. 9. Secret part.

Johnson, 2 *A Dictionary of the English Language* at 469.

dissolution, as "the civil death of the parliament"). The implication of permanence supports an understanding of recess to mean only intersession breaks because these are followed by an adjournment *sine die*, which are adjournments without a set date for reconvening. And the implication of longevity supports the idea that recess includes long intrasession breaks.

Neither of these implications is consistent with the Board's unavailable-for-business definition of recess, but other entries in Johnson's dictionary provide some support for that definition. Johnson's definition of recess includes "[r]emission or suspension of any procedure." Johnson, 2 *A Dictionary of the English Language* at 469. And, of course, words such as "departure" also have less permanent implications than death. Johnson, 1 *A Dictionary of the English Language* at 568 (defining "departure" as "[a] going away"). The term "recess," by itself, thus lacks a literal meaning that unambiguously supports one of the three definitions.

2. The Historical Use of Recess

Importantly, though, the Constitution does not say only "Recess." Rather, it limits the president's recess-appointments power to the "Recess *of the Senate*." The words "of the Senate" provide some context for our analysis: parliamentary procedure at the time of ratification. *Deal v. United States*, 508 U.S. 129, 132 (1993) ("[T]he meaning of a word cannot be determined

in isolation, but must be drawn from the context in which it is used.").

American colonial legislatures and the first Senate largely derived their parliamentary procedures from the procedures used by the English Parliament. *See* Henry M. Robert III, et al., *Robert's Rules of Order: Newly Revised* xxxiv–xxxv (11th ed. 2011) (recounting the migration of English procedures to the American colonies); Thomas Jefferson, *A Manual of Parliamentary Practice: For the Use of the Senate of the United States* (2d ed. 1812) (relying heavily on English precedents in providing procedural rules for the Senate). English parliamentary procedure at the time had three types of breaks: adjournments, which were "continuances of the session from one day to another . . . and sometimes a fortnight or a month together"; prorogations, which were "continuances of the parliament from one session to another" initiated by the king; and dissolutions, which were terminations of a Parliament initiated by the king's order, his death, or a length of time that necessitated new elections before another Parliament could be convened. 1 William Blackstone, *Commentaries* \*186–89; *see also* Jefferson, *supra*, § 51 at 164–65; Michael B. Rappaport, *The Original Meaning of the Recess Appointments Clause*, 52 U.C.L.A. L. Rev. 1487, 1550–51 (2005). The Parliament thus had three breaks: adjournments for intrasession breaks and prorogations as well as dissolutions for intersession breaks.

At first blush, these three types of breaks appear to correspond with the three mechanisms for breaks referred to in our Constitution. "Adjournment," or its verbal form "adjourn," is the same phrase the Constitution uses to denote day-to-day and longer breaks within sessions of either chamber. U.S. Const. art. I, § 5, cl. 1 (allowing a minority of members to "adjourn from day to day"); *id.* art. I, § 5, cl. 4 (requiring concurrence between both chambers if, "during the session of Congress," they are to "adjourn for more than three days").[12] The word "dissolution" does not appear in the Constitution,

---

[12] The words adjourn or adjournment appear six times in five clauses of the Constitution. U.S. Const. art. I, § 7, cl. 2 ("If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress by their adjournment prevent its return, in which case it shall not be a law."); *id.* at art. I, § 7, cl. 3 ("Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States"); *id.* at art. II, § 3 ("[The President] may, on extraordinary occasions, convene both Houses, or either of them, and in case of disagreement between them, with respect to the time of adjournment, he may adjourn them to such time as he shall think proper.").

probably because the president does not have the power to dissolve Congress. *See id* at art. II, § 3 (providing that the president, at most, "may adjourn [Congress] to such time as he shall think proper" if they cannot agree on "the time of adjournment"); The Federalist No. 69 (Alexander Hamilton) (explaining the powers of the president and how they are less than those of the king and even the governor of New York by contrasting the president's power to "only adjourn the national legislature" with the "British monarch['s]" power to "prorogue or even dissolve the Parliament"). But the concept of dissolution is still present in the Constitution: Congress is automatically dissolved—and any ongoing session ended—every two years by termination of the terms of one-third of Senators and all members of the House. U.S. Const. art. I, § 2, cl. 1; *id*. art. I, § 3, cls. 1–2. These dissolutions end a session and, following elections, begin another session in a new Congress, *see* Jefferson, *supra*, § 51 at 166 ("A dissolution certainly closes one session; and the meeting of the new Congress begins another.")—just as the king's dissolution, or the dissolution by the passage of time, did for the English Parliament, 1 William Blackstone, *Commentaries* *189.

In light of these parallels, it is tempting to say that "Recess of the Senate" corresponds with prorogations and thus must refer only to terminations of sessions and the intersession breaks that follow them. But this argument proves too much. Even though the Constitution

45

uses "adjournment" to mean breaks within a session, it also uses the term to mean breaks between sessions. The Supreme Court held in the *Pocket Veto Case*, 279 U.S. 655 (1929), that "adjournment" in Article I, § 7, clause 2 of the Constitution is any break in business "that prevents the President from returning the bill to the House in which it originated within the time allowed." *Id.* at 680 (internal quotation marks omitted); *see also* U.S. Const. art. I, § 7, cl. 2 (providing that a bill passed by Congress becomes law after ten days after presentment to the president "unless the Congress by their adjournment prevent its return"). This definition does not distinguish between breaks within sessions and those between sessions. *See id.*; *accord* Rappaport, *supra*, at 1551 n.198 (explaining that "the Framers used the term 'adjournment' with a broader meaning than it had traditionally under English law"). This means that the Constitution does not simply adopt "adjournment" as it was used in Parliament and correspondingly suggests that "Recess of the Senate" is not simply prorogation by another name.

Understanding the differences between prorogation and adjournment is helpful, however, to make sense of ratification-era state constitutions.[13] Eight of these

---

[13] The dissent argues that our discussion of state constitutions and early American practice transforms our definition of recess into a technical one. Dissenting Op.

46

constitutions use the word "recess." Six contain the same ambiguity found in the federal Constitution.[14] The word

---

at 16–18 & n.11. These sources are, however, frequently relied on by the Supreme Court to decide the meaning of Constitution. *See, e.g.*, *Heller*, 128 S. Ct. at 585–86; *Collins v. Youngsblood*, 497 U.S. 37, 42 (199). We, too, consider such reliance to be appropriate because the average citizen likely would have understood the Constitution in reference to the state constitutions and practices at the time.

[14] *See* Del. Const. of 1776 art. 7; Md. Const. of 1776 pt. 2, art. XIII; N.C. Const. of 1776 pt. 2, arts. XVIII–XX; Pa. Const. of 1776 pt. 2, § 20; S.C. Const. of 1778 arts. IX, XVIII, XXXV; Vt. Const. of 1777 ch. II, §§ XVII–XVIII.

Of these provisions, the North Carolina Constitution's Recess Appointments Clause has been argued to be the most relevant to the federal Recess Appointments Clause because the federal clause is thought by some to be modeled after the North Carolina one. *Noel Canning*, 705 F.3d at 501. The North Carolina Constitution gives the governor power to "grant[] temporary commission[s]" of officers "whose appointment[s] [were] by [the North Carolina] Constitution vested in the General Assembly . . . during their recess." N.C. Const. of 1776, pt. 2, art. XX. Recess here is essentially used in the same manner that it is in the federal constitution, which limits the

"recess" in the Massachusetts and New Hampshire constitutions, however, includes only intersession breaks. *See* Rappaport, *supra*, at 1552. These constitutions have similar provisions that provided their respective governors with different powers depending on whether the legislature was in "session" or "in recess." Mass. Const. of 1780, pt. 2, ch 2, § 1, art. V; N.H. Const. of 1792 pt. 2, § L. When the legislatures were in "session," the governors had the power either to prorogue or to adjourn them. *See, e.g.*, Mass. Const. of 1780, pt. 2, ch. 2, § 1 ("The Governor . . . shall have full power and authority, during the session of the General Court [i.e., the Massachusetts legislature], to adjourn or prorogue the same to any time the two Houses shall desire"). But when

---

recess-appointment power to "the Recess of the Senate." Both constitutions thus contain the same ambiguity.

The D.C. Circuit concluded that this ambiguity is clarified for the North Carolina constitution by a North Carolina Supreme Court decision that the D.C. Circuit argues implicitly distinguishes between session and recess. *Noel Canning*, 705 F.3d at 501. We disagree. The North Carolina Supreme Court opinion is not informative because—as the Board argues—the question in the case was not the meaning of "recess" but whether a recess-appointed judge's court had jurisdiction to determine whether he was properly appointed. *Beard v. Cameron*, 3 Mur. 181, 184–86 (N.C. 1819).

the legislatures were "in recess," the governors only had the power to prorogue them—or, in simpler terms, extend the duration of the intersession recess, *see* Johnson, 2 *A Dictionary of the English Language* 412 (defining "prorogue" as "to withhold a session of parliament to a distant time."). *See, e.g.*, Mass. Const. of 1780, pt.2, ch 2, § 1 (providing the governor, "in the recess of the said Court," the power "to prorogue the same from time to time"). These provisions make sense only if the legislature is not in "session" when it is "in recess." Otherwise, the provisions are in conflict, stating that the governors both had and did not have the power to adjourn the legislature during intrasession breaks. These two constitutions thus used recess to mean intersession breaks only.[15]

---

[15] The intersession-breaks-only definition of recess is also seen in a second way. As explained, the governors only had the power to prorogue when their respective legislatures were "in recess"; but they had the power to both adjourn as well as to prorogue the legislatures when they were in session. *See* Mass. Const. of 1780, pt. 2, ch 2, § 1, art. V; N.H. Const. of 1792 pt. 2, § L. This is telling because if recess included intrasession breaks as well as intersession breaks, then the power to adjourn ought to also be included. Recall that one central difference between adjournments and prorogations is that the former do not end all business such that it need be

There are, however, examples of state executives assuming that a constitutional recess includes intrasession breaks. Vermont and Pennsylvania's former constitutions, for example, provided their respective executives power to "lay embargoes . . . in the recess of the house only." Vt. Const. of 1777, ch. 2, § XVIII; Pa. Const. of 1776, pt. 2, § 20. Governors of both states imposed embargos during intrasession breaks,[16] which

started anew when the legislature reconvenes while the latter do end business. Jefferson, *supra*, at 164–65. So in these constitutions, while the legislatures were in session, the governors had the option of either ending business through prorogation or, through adjournment, merely ending their meetings but without ending their business. There is no obvious reason that if recess included intrasession breaks—after which business that was ongoing before the break would continue—the governors would lose their power to end that business. The most plausible explanation of the differing powers in each situation is that recesses were only constituted of intersession recesses, which made it unnecessary to provide the governors the power to adjourn the legislatures because there was no business that could be continued. The Massachusetts and New Hampshire constitutions thus used recess to mean intersession recesses only.

[16] For the Vermont example, *see* 3 J. & Proceedings of the General Assemb. of the State of Vt. 235 (P.H. Gobia

Press 1924) (recording the Vermont Assembly's "adjourn[ment] until the second Wednesday of June" on April 16, 1781); 2 Records of the Governor and Council of the State of Vt. 164 (E.P. Walton ed., 1874) (recording the May 1781 imposition of an embargo by the executive). This was an intrasession break because the legislature had not adjourned without day, as they often did to end the last meeting of the year. *See, e.g.*, 3 J. & Proceedings of the General Assemb. of the State of Vt. at 31 (adjourning on June 17, 1778 "until his Excellency the Governor commands them to meet"), 73 (adjourning "without day" on June 4, 1779); 123 (adjourning "without day" on March 16, 1780); 271 (adjourning "without day" on June 28, 1781).

For the Pennsylvania example, *see* J. & Minutes of the Pa. Assembly 212 (1778) (recording the Pennsylvania House of Representatives' adjournment on May 25, 1778 "to meet on the 9th day of *September* next" and its subsequent reconvening on August 4, 1778 pursuant to the summons of the "vice-president and [s]upreme executive council"); 11 Minutes of the Supreme Exec. Council of Pa. 544–45 (Theo Fenn & Co., 1852) (recording the August 1, 1778 imposition of an embargo by the executive). The Board has stated that this intrasession break lasted until September 9, 1778. This does not take into account the Pennsylvania House of Representative's being recalled on August 4, however. This discrepancy does not undermine the Board's general

51

suggests they understood that such breaks were included in the meaning of recess.

The New Jersey governor acted similarly. He relied on the Senate Vacancies Clause in the federal Constitution to appoint a senator on December 19, 1798. 8 Annals of Cong. 2197 (1798). Prior to the Twentieth Amendment, this Clause allowed state executives to make temporary appointments of Senators "during the Recess of the Legislature of [that] State." U.S. Const. art. I, § 3, cl. 2. His appointment of a senator on December 19, 1798, shows that he construed recess to include intrasession breaks because the New Jersey General Assembly was in an intrasession break from November 8, 1798, until January 16, 1799.[17]

---

point that the embargo was set by the executive during an intrasession break because the May 25 adjournment was not an adjournment *sine die* and the August 1 embargo imposition is before the Assembly's August 4 reconvening date.

[17] Votes and Proceedings of the Twenty-Third General Assemb. of the State of N.J, 1st sitting, 64 (1798–99) (recording the adjournment of the New Jersey General Assembly); J. of Proceedings of the Legis. Council of the State of N.J., 23d Sess., 1st sitting 20 (1798–99) (recording the adjournment of the New Jersey Legislative Council).

This history shows that recess had at least two meanings at the time of ratification: either intersession breaks only or intersession breaks plus long intrasession breaks. The state constitutions favor the former, while the governors' actions favor the latter. To be sure, the executive's actions should be viewed with some skepticism because an expansive definition of recess served their institutional self-interest by expanding their powers. *See* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 558–59 (1994) (explaining that post-enactment actions by the first Congress must be viewed cautiously because of their institutional interest in limiting the president's power). But it would be erroneous to reject their understanding on this basis alone. Nothing in the historical record affirmatively rejects their understanding for purposes of the federal Constitution.[18] But neither is there anything affirmatively

---

[18] Besides state-executive practice, the Board also points to the Continental Congress's understanding of the meaning as revealed by its practices. NLRB Ltr. Br. at 6 & n.3. Under the Articles of Confederation, the Congress could only convene a "Committee of the States" during "the recess of Congress." Articles of Confederation of 1781, art. IX, para. 5; *id.* art. X, para 1. Such a committee was convened during the period that followed the Continental Congress's adjournment on June 3, 1784 until October 30, 1784. 27 J. of Continental Congress

establishing that it adopted this definition of recess in lieu of the definition found in the Massachusetts and New Hampshire constitutions. Standing alone, "Recess of the Senate" is thus ambiguous. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 222 (3d Cir. 2010) ("Words or provisions are ambiguous when 'they are reasonably susceptible of different interpretations.'" (quoting *Dobrek v. Phelan*, 419 F.3d 259, 263 (3d Cir. 2005))).

Importantly, though, neither of these possibilities is similar to the unavailable-for-business definition put forth by the Board. Every example discussed thus far has two common characteristics. First, each break lasted for a considerable period of time. The intrasession breaks in

---

555 (1784). That this adjournment was until a fixed date suggests that the period after ought to have been an intrasession break because it was not an adjournment *sine die*, which would be denoted by the absence of a fixed reconvening date. Subsequent proceedings, however, call this understanding into question because the Continental Congress's journal does not record their reconvening on October 30 but instead shows them convening when the Articles of Confederation required they meet again, 28 J. of Continental Congress 639–41 (1784) (convening "[p]ursuant to the Articles of Confederation," rather than pursuant to the prior adjournment), which is consistent with having adjourned *sine die*. We decline to rely on this practice one way or another because of the uncertainty.

which the governors of Vermont and Pennsylvania used their powers were 57 and 71 days, respectively. *See supra* note 10. And the intrasession break in which the New Jersey governor appointed a senator was 69 days. *See supra* note 11. As far as we are aware, the shortest break referred to as a recess lasted 14 days, 2 *A Documentary History of the English Colonies in North America* 1346–48 (Peter Force, ed., 1839), which conforms with the modern practice equating recess with breaks lasting at least 10 days. These durations suggest that a recess was more than the day-to-day adjournment of a legislature and likely held the connotation of long duration. This is contrary to the Board's current view that breaks in business need not be of any particular duration to constitute a recess.

The second notable trait of these breaks is that the beginning of each was determined solely by when the legislature adjourned—rather than by some functionalist definition of when the body was unavailable for business. The Board has pointed to no examples of the word "recess" turning on factors such as whether members were required to attend, the legislative chamber was empty, and the body could receive messages. The examples instead show that recess was tied to the type, or possibly the duration, of the legislature's self-defined adjournment. *Accord* Jefferson, *supra*, at 51 at 165 (explaining that Senate "Committees may be appointed to sit during a recess by adjournment, but not by

55

prorogation").

In short, the natural meaning of recess does not help us decide between intersession breaks and intrasession breaks of a fixed duration, but the relevant context does undermine the Board's current position.[19]

---

[19] The dissent refers to our reliance on state constitutions and contemporary interpretations of recess as a "dubious" method of interpretation. Dissenting Op. at 20. To be clear, these historical examples demonstrate that the use of recess at the time of ratification was consistent with either the intersession-break definition of recess or the intersession-plus-long-intrasession-break definition. We discuss these only to show the ordinary meanings of the word "recess" for the founding generation, as demonstrated by their usage. *Heller*, 554 U.S. at 576. We do not use them as conclusive evidence that recess means intersession breaks only, which cannot be done because there is not sufficient historical evidence on which meaning was intended in the Constitution.

These historical practices do, however, cast doubt on the unavailable-for-business definition argued for by the Board, a version of which is adopted by the dissent. This is not so much because of what the practices *were* but what they *were not*. Namely, the Board and the dissent cannot point to a single example from the period of ratification in which a legislative body or executive defined recess exclusively using a functionalist definition

To resolve the remaining ambiguity, one might argue that the Constitution uses a definitive article: "*the* Recess of the Senate." The word "the" might mean that the phrase refers to a specific thing, possibly suggesting that recess refers to the one recess that follows every session, an intersession break. *See Noel Canning*, 705 F.3d at 499–500. But "the" also can denote a particular class of something as well. Indeed, that is how the D.C. Circuit ultimately interpreted "the Recess," holding that it means all intersession breaks. *Id.* But even conceding that "the" is meant to denote a specific class of something, there is nothing in the word "the" itself that necessarily requires that class to be intersession breaks. "[T]he Recess" might, for example, simply refer to times in which the Senate is in a recess. *See Evans*, 387 F.3d at 1224–25. There is nothing that shows what "the" means in the Recess Appointments Clause, especially because the Constitution uses "the" in several manners. *See, e.g.*, U.S. Const. art. I, § 3, cl. 4 (providing that "[t]he Vice President . . . shall be President of the Senate"); art. I, § 3, cl. 5 (providing that the Senate shall select a president pro tempore "in the Absence of the Vice President"). Accordingly, we are convinced that use of "the" is uninformative. We must therefore look to the

---

based on availability. If such a definition of recess were a "normal and ordinary" meaning for the "founding generation," *Heller*, 554 U.S. at 576, there ought to be at least one example of its use from that period.

broader textual context in which "the Recess of the Senate" was ratified.

B.     Textual Context

1. Constitutional Context and the Unavailable-for-Business Definition

"If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power, it is a well settled rule, that the objects [i.e., the purpose] for which it was given . . . should have great influence on the construction." *Gibbons v. Ogden*, 22 U.S. 1, 188–89 (1824). The purpose of the Recess Appointments Clause is most evident in its relation to the Appointments Clause. The text and structure of the Constitution demonstrate that the Recess Appointments Clause is a secondary, or exceptional, method of appointing officers, while the Appointments Clause provides the primary, or general, method of appointment. The Appointments Clause provides the general rule for appointing officers through presidential nomination and senatorial advice and consent. U.S. Const. art. II, § 2, cl. 2. The Clause lacks any limitation on when this power is operative—the president *always* has the power to fill vacancies through nomination and the advice and consent of the Senate. *See id.* ("[The President] shall nominate, and by and with the Advice and Consent of the Senate,

shall appoint . . .").[20] This perpetual power stands in contrast to the power given to the president in the Recess Appointments Clause, which explicitly allows him to fill vacancies unilaterally only "during the Recess of the Senate." *Id.* at art. II, § 2, cl. 3. The clauses thus reveal a constitutional preference for divided power over the

---

[20] The Appointments Clause states in full:

> He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

appointments process, which is deviated from only in specified situations.[21]

Alexander Hamilton echoed this understanding of the Constitution. He explained in Federalist 67 that the Appointments Clause "declares the general mode of appointing officers of the United States." The Federalist No. 67 (Alexander Hamilton). The Recess Appointments Clause, however, is "nothing more than a supplement to the [the Appointments Clause], for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate." *Id.* Accordingly, the "ordinary power of appointment is confined to the president and the Senate *jointly*, and can therefore only be exercised during the session of the Senate." *Id.* (emphasis in original). But "*in [the Senate's] recess*," the "President, *singly*," has power to make temporary appointments. *Id.* (emphasis in original). This deviation is necessary, Hamilton argues, because it is "improper to oblige this body to be continually in session" and because "it might be necessary for the

---

[21] Besides the exception found in the Recess Appointments Clause, the Appointments Clause also creates an exception for "inferior Officers." These officers can be appointed either through the ordinary process or, if specified by statute, unilaterally by the President, courts, or department heads. *See* U.S. Const. art. II, § 2, cl. 2.

public service to fill without delay." *Id.*

The "main purpose" of the Recess Appointments Clause, therefore, is not—as the Eleventh Circuit held and the Board argues—only "to enable the President to fill vacancies to assure the proper functioning of our government." *Evans*, 387 F.3d at 1226. This formulation leaves out a crucial aspect of the Clause's purpose: to preserve the Senate's advice-and-consent power by limiting the president's unilateral appointment power. *Accord Noel Canning*, 705 F.3d at 505 (explaining that the Eleventh Circuit's statement of the Clause's purpose "omits a crucial element of the Clause, which enables the president to fill vacancies *only when the Senate is unable to provide advice and consent*" (emphasis in original)).

The importance of this aspect of the Clause's purpose is difficult to understate. At the time of ratification, skepticism in executive unilateral appointments power was firmly established. "'[T]he power of appointments to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism.'" *Freytag*, 501 U.S. at 883 (quoting Gordon Wood, *The Creation of the American Republic 1776–1787* 79 (1969)). But the framers' skepticism concerning unilateral power was not limited to the executive. They also rejected unilateral legislative control of appointments out of concern for "diversity of views, feelings, and interests, which frequently distract and warp the resolutions of a collective body." The Federalist No.

76 (Alexander Hamilton). As a consequence of these concerns, the framers sought to "ensure that those who wielded [appointments powers] were accountable to political force and the will of the people" by limiting the power of any one person or body. They did so by dividing that power between the executive and legislative branches. *Freytag*, 501 U.S. at 883–84; *see also Ryder*, 515 U.S. at 182 ("The [Appointments] Clause is a bulwark against one branch aggrandizing its power at the expense of another branch, but it is more: it preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power."). To ignore this division of power is to neglect a central principle that underlies the two Appointments Clauses.[22]

---

[22] The dissent understands this principle to mean that one purpose of the Recess Appointments Clause is "to provide a check on the Senate's control over the appointment of officers by sharing the power of confirmation with the executive." Dissenting Op. at 28. While we agree that the Clause is intended to preserve the balance of power struck in the Appointments Clause, we disagree that it does this by limiting the Senate's power to provide its advice and consent. The Recess Appointments Clause preserves the balance of power by limiting the instances in which the president has unilateral authority to appoint officers, which is illustrated by its explicit limitation of that power to "the

Recess of the Senate." Nothing in the text of the Clause or the historical record suggests that it is intended to be a type of pressure valve for when the president cannot obtain the Senate's consent, whether that be because it has become dysfunctional or because it rejects a president's nominations. *Cf.* The Federalist No. 67 (Alexander Hamilton) (explaining that the Clause is needed because it is "improper to oblige this body to be continually in session" or because "it might be necessary for the public service to fill without delay" rather than because it is a necessary tool to check the Senate's power).

Our disagreement with our dissenting colleague is rooted in a difference in understanding of the president's and the Senate's respective powers. Regarding the president, the dissent contends that we must interpret the president's recess-appointment power broadly because to do otherwise would "eviscerat[e] his appointments prerogative" so that he may "be able to surround himself with the people he believed best fit to help him fulfill his duty." Dissenting Op. at 23–24. But the president does not have an "appointments prerogative" or the constitutional right to surround himself with those he believes are "best fit to help." That is exactly what the drafters rejected when they rejected unilateral appointments authority in the executive. The president has a prerogative to *nominate* whomever he likes, and the Senate has the prerogative to reject or confirm whomever

And therein lies the implausibility of the unavailable-for-business definition. As explained above, the Board argues that a recess occurs any time members

---

the president nominates. To construe the Recess Appointments Clause as providing presidents these rights is to promote it from an auxiliary appointments device to an additional one, which we know from Hamilton is exactly what it is not. *See* Federalist No. 67 (Alexander Hamilton).

Regarding the Senate's advice-and-consent power, the dissent analogizes it to the president's veto power. Dissenting Op. at 21–23 & nn.14–15. This analogy is inaccurate. The drafters of the Constitution rejected an approval mechanism proposed by Madison that gave the Senate only the power to veto presidential nominees by a majority vote in favor of "advice and consent." 2 The Records of the Federal Convention of 1787 at 80–83 (Max Farrand ed., 1911); *see also* Matthew C. Stephenson, *Can the President Appoint Principal Executive Officers without a Senate Confirmation Vote?*, 122 Yale L.J. 940, 964–95 (2013). This means there is no reason to think that the balance of powers created through provisions of the advice-and-consent power to the Senate is anything like the president's veto power. As we have explained, the balance is much more equitable between the branches and provides each the ability to negate the role of the other.

of the Senate do not have a duty to attend, the Senate chamber is empty, and the Senate is unavailable to receive communications from the president. *See* Resp. Br. at 44–45; 33 U.S. Op. Att'y Gen. at 21–22, 25. The problem with this definition is that the Senate fulfills these criteria whenever its members leave for the weekend, go home for the evening, or even take a break for lunch. In each of these instances, the senators have no duty to attend, the Senate chamber is empty, and the body cannot receive messages from the president.

Defining recess in this way would eviscerate the divided-powers framework the two Appointments Clauses establish. If the Senate refused to confirm a president's nominees, then the president could circumvent the Senate's constitutional role simply by waiting until senators go home for the evening. The exception of the Recess Appointments Clause would swallow the rule of the Appointments Clause.

The Board appears to recognize this difficulty with its definition. Oral Arg. Tr. at 48:6–9 (stating that "[t]he executive branch has not claimed authority to make recess appointments during lunch"). Accordingly, the Board argues that there is a limitation in addition to the three open-for-business criteria: unavailability to provide advice and consent. Oral Arg. Tr. at 49:15–18. But the Board does not clearly define unavailability in a way that distinguishes it from the Board's discussion of when the Senate is open for business. At times, its brief treats the

two requirements as one. Resp. Br. at 44 ("[T]he Clause authorizes appointments when the Senate is not open to conduct business and thus not providing advice and consent on nominations.").

Perhaps the best indication of what the Board means by unavailability is its reliance on the Senate's unanimous-consent agreement that established the schedule for the *pro forma* sessions from December 20, 2011, through January 23, 2012. This resolution provided that there would be "no business conducted" during the sessions. 157 Cong. Rec. at S8783 (statement of Sen. Wyden). This resolution might be understood to mean that during the *pro forma* sessions the Senate was open for business but unavailable to provide advice and consent on nominations because of the body's prior agreement.

The first problem with this argument is that the Senate's actions under the resolution reveal that it could have provided advice and consent during these *pro forma* sessions if it had desired to do so. On December 23, 2011, during one of the *pro forma* sessions stipulated in the unanimous-consent agreement, the Senate passed a bill that provided "a 2-month extension of the reduced payroll tax, unemployment insurance, TANF, and the Medicare payment fix." 157 Cong. Rec. at S8789 (statement of Sen. Reid). That same day, the Senate also "agree[d] to the request for a conference" from the House in relation to related bills passed by both chambers. *Id.* If

66

the Senate could pass a bill and agree to a request from the House to create a conference for another bill, then the Senate likely could have provided its advice and consent but chose not to—as they are entitled to under the Appointments Clause.[23]

---

[23] The dissent rejects this conclusion on the ground that if the Senate is available any time it could act on nominations "if it had the desire[] to do so," then the Senate would logically always be available. Dissenting Op. at 51. This misses one central feature of *pro forma* sessions: the Senate has convened. We do not hold that the Senate is available any time when it could confirm nominations if it wanted to. Instead, we are pointing out that the Board cannot distinguish *pro forma* sessions from ordinary sessions on the basis of the Senate's availability because during *pro forma* sessions the Senate convenes in a manner that allows it to consent to nominations if it desires to. This is evidenced by the Senate's passing of legislation during these sessions. Holding that the Senate is unavailable during these sessions requires a definition of availability that allows the counterintuitive situation in which the Senate is available to enact legislation while simultaneously unavailable to provide its advice and consent.

The dissent suggests one possibility, which is that the Senate is not available to provide its advice and consent during *pro forma* sessions because "business via

Besides this factual difficulty, the Board's limiting principle has another, larger problem: it still does not foreclose day-to-day adjournments from constituting

---

unanimous consent agreement . . . is not the type of business that yields the advice and consent envisioned by the Framers." ***Id*. at 29.** Underlying this is the assertion that advice and consent requires a vote by the Senate's members. ***Id*. at 7.** This is a complicated question. *See* Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A Historical and Textual Inquiry*, 29 Harv. J.L. & Pub Pol'y 103, 107–08, 147–48 (2005) (collecting sources arguing the Senate is required to act on nominations before analyzing the text and convention debates to conclude that the Senate has no obligation to act on presidential nominees). We are reluctant to express an opinion on it, especially because it has not been briefed.

Assuming that a vote is required to provide the Senate's advice and consent, however, it is also the case that the Senate must vote to "pass" a bill. *See Chadha*, 462 U.S. at 980–81 (equating pass with vote). Why unanimous-consent agreements are sufficient to pass legislation, and thus constitute a vote, yet are inadequate to constitute a vote for the purpose of advice and consent is unclear. The dissent's definition thus suffers from the same flaw as the Board's: it cannot provide a principled method of defining availability.

68

recesses. The important feature of the Senate's scheduling agreement that the Board emphasizes is the provision that there would be "no business conducted." Resp. Br. at 45–47; Oral Arg. Tr. at 49:21–24. This, however, is indistinguishable from a daily adjournment. At the end of the day, the Senate adjourns, which represents an agreement that it will do no business until it reconvenes the next day. In fact, when the Senate agrees to adjourn, it agrees that no senator can even be recognized to speak on the floor. *See Riddick's Senate Procedure: Precedents and Practices*, S. Doc. No. 101-28, at Adjournment 2 (1992) ("Once the Chair has announced that the Senate stands in adjournment, there is no recourse available to the Senator seeking recognition until the Senate reconvenes."). The only distinction is formalistic—day-to-day adjournments are embodied in a motion to adjourn (that is often unanimously agreed to) rather than a unanimous consent agreement—but there is no reason to believe that makes an actual difference under the Board's approach. Therefore, the Board's limiting principle fails to limit the meaning of recess and must be rejected to prevent the Recess Appointment Clause's exception from swallowing the rule of divided power.

Now that we have established what "the Recess of the Senate" does *not* mean, we must establish what it *does* mean. The Recess Appointments Clause's preservation of the Senate's advice-and-consent power

69

does not help us decide between the remaining two possibilities because the requirement that an intrasession break last a certain duration would prevent the exception from swallowing the rule. We must therefore look to provisions of the Constitution.

Several constitutional provisions appear relevant to our analysis, such as those that use the word "adjournment." *See Noel Canning*, 705 F.3d at 500. Adjournment, as discussed above, is an instance in which Congress or one of its chambers takes a break of any type or length. *See, e.g.*, *Pocket Veto Case*, 279 U.S. at 680 (interpreting "adjournment" in the Pocket Veto Clause to include both types of breaks). Thus, if the framers had intended for the president to be able to appoint officers during intrasession breaks, then the Recess Appointments Clause could have been worded differently, allowing recess appointments "during the *Adjournment* of the Senate." *See Noel Canning*, 705 F.3d at 500, 505–06. Because the Constitution uses recess instead of adjournment, we presume that recess has a meaning different from adjournment. *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 496 (2005) ("When interpreting the Constitution, we begin with the unremarkable presumption that every word in the document has independent meaning, 'that no word was unnecessarily used, or needlessly added.'") (quoting *Wright v. United States*, 302 U.S. 583, 588 (1938)).

That the words have different meanings, however,

70

does not necessarily tell us what those meanings are and whether they might overlap. The Eleventh and D.C. Circuits provide two different possibilities. On the one hand, adjournment could mean the act of adjourning (i.e., ending business) for any period of time, while recess could refer to the period of time that follows an adjournment. *Evans*, 387 F.3d at 1225. On the other hand, adjournment could again mean the act of adjourning for any period of time, while recess might refer to breaks of a more limited nature—whether that be limited by the duration of the break or the type of break. *Noel Canning*, 705 F.3d at 500. In both instances, adjournment and recess have different meanings but nothing about the dichotomy between the words tells us which meaning was intended.

When these possibilities are considered in light of the purpose of the Recess Appointments Clause, however, the dichotomy must be that adjournment results in more breaks than recess does. If the Eleventh Circuit is correct that the sole reason for using recess instead of adjournment was to recognize a difference between the act of adjourning and the period that follows, then recess would mean any break in Senate business regardless of the break's length. This is a broad definition that no one, including the Board, adopts because it would result in the exception swallowing the rule. So the dichotomy does reveal that recess must mean something narrower than any break that follows an adjournment.

71

But what this narrower definition is cannot be derived from the dichotomy between adjournment and recess alone. Nothing about the words tells us whether recess is limited by the duration of the break (as the intrasession definition does) or by the type of break (as the intersession definition does). *Contra Noel Canning*, 705 F.3d at 500, 505–06 (using the dichotomy plus the fact that recess is preceded by "the" as support for its conclusion that "the Recess" must mean intersession breaks only). The dichotomy between adjournment and recess therefore leaves us in the same place as the Recess Appointments Clause's purpose: rejecting an all inclusive definition of recess but without a basis to decide between the intersession definition and the intersession-plus-long-intrasession-breaks definition.

2. Constitutional Context and the Remaining Definitions

We resolve this uncertainty by first noting what is absent in the Constitution: a link between "the Recess of the Senate" and any particular length of time. Attorney General Daugherty, who first suggested a minimum duration of ten days, did not tie this duration to any constitutional provision. *See* 33 U.S. Op. Att'y Gen. at 24–25 ("Nor do I think an adjournment for 5 or even 10 days can be said to constitute the recess intended by the Constitution."). Some have tried to tie the duration to the Adjournment Clause, which requires either chamber of Congress to obtain the consent of the other to adjourn

72

for more than three days, U.S. Const. art. I, § 5, cl. 4.[24] *See, e.g.*, 33 U.S. Op. Att'y gen. at 24–25 (invoking the Adjournment Clause to reject the idea that two days may constitute a recess); Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 419–21 (2005). The argument is that the Adjournment Clause provides a measure of what constitutes a *de minimis* break—one that should be read into the Recess Appointments Clause to prevent the exception from swallowing the rule. *See* Hartnett, *supra*, at 419–21.[25] The central error in this

---

[24] The Clause states:

> Neither House, during the session of Congress, shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting.

U.S. Const. art. I, § 5, cl. 4.

[25] The Adjournment Clause may be thought to create a problem for the intersession definition of recess. Namely, by requiring that the two chambers of Congress agree on any adjournment lasting longer than three days, the Clause enables the House to prevent the Senate from adjourning *sine die*. This would be problematic for the intersession definition because, as the argument goes, it inserts the House into the appointments process even

argument, however, is that "[n]othing in the text of either Clause, the Constitution's structure, or its history suggests a link between the Clauses." *Noel Canning*, 705 F.3d at 504; *cf. Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433–34 (1993) (demonstrating that the context of individual provisions is important to deciding the meaning of them by explaining that the same words in the Constitution often have different meanings depending on their context). Absent some connection, there is no reason to believe that the Adjournment Clause's duration requirement controls the meaning of the Recess Appointment Clause. And beyond the Adjournment Clause, nothing in the Constitution establishes the necessary length of an intrasession break

---

though the Constitution purposely excludes it from the process.

The problem is eliminated, however, by Article II, § 3 of the Constitution. This provision allows the president to "adjourn both Houses" only "if the two Houses cannot agree on a date of adjournment." U.S. Const. Art. II, § 3. Assuming that the Supreme Court would interpret adjourn to be the verbal form of adjournment, which it has said constitutes both inter- and intra-session breaks, *Pocket Veto Case*, 279 U.S. at 680, this provision allows the president to prevent the House from interfering in the appointments process if it prevents the Senate from adjourning for either an inter- or intra-session break.

74

that would constitute a recess.[26] This is the most significant weakness of the long-break intrasession argument.

Although there is no constitutional basis for any sort of durational limit on what constitutes "the Recess," the Recess Appointments Clause *does* contain a temporal characteristic: the Recess Appointment Clause's specification that recess-appointed officers' terms "shall expire at the End of [the Senate's] next Session." U.S. Const. art. II, § 2, cl. 3. A session of the Senate, everyone agrees, begins at the Senate's first convening and ends either when the Senate adjourns *sine die* or automatically expires at noon on January 3 in any given year. Henry B. Hogue, Cong. Research Serv., RS21308, *Recess Appointments: Frequently Asked Questions* 1–2 & n.5

---

[26] Another possible source of a durational limitation on recess is the Pocket Veto Clause, which provides that a bill passed by Congress becomes a law if the President takes no action on it for ten days "unless the Congress by their adjournment prevent its return." U.S. Const. art. I, § 7, cl. 2. The ten-day-duration requirement that might be drawn from this fails for the same reason the three-day-duration requirement fails in relation to the Adjournment Clause. Namely, the context of the Pocket Veto Clause is significantly different from the context of the Recess Appointments Clause, which means there is no reason to believe the former controls interpretation of the latter.

(2012). The expiration of these officers' terms at the end of the *next* session implies that their appointments were made during a period between sessions.

This implication follows from the reason for making recess appointments expire at the end of the "next Session." As discussed, the Recess Appointment Clause provides an "auxiliary" method of appointing officers. The Federalist No. 67 (Alexander Hamilton) (explaining that the Clause is "nothing more than a supplement to the [Appointments Clause]" that "establish[es] an auxiliary method of appointment, in cases to which the general method is inadequate"). The durational provision maintains this by limiting recess appointees' terms to last for only the time needed for the president and the Senate to have the opportunity to undergo the normal process. As Justice Joseph Story explained, the Clause authorizes the president "to make temporary appointments during the recess, which should expire, when the senate should have had *an opportunity* to act on the subject." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1551 at 410 (1833) (emphasis added). Limiting the duration to a single opportunity follows from the auxiliary nature of the Clause. After all, the Senate's decision not to act on a nomination effectively is a rejection of that nomination, as evidenced by the Senate's routine return to the president of nominations who have not been acted on. Standing Rules of the Senate XXXI, para. 6

("Nominations neither confirmed nor rejected during the session at which they are made shall not be acted upon at any succeeding session without being again made to the Senate by the President."). In fact, a system in which Senate silence would allow for the appointment of officers was explicitly rejected at the drafting convention. 2 The Records of the Federal Convention of 1787 at 80–83 (Max Farrand ed., 1911); *see also* Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A Historical and Textual Inquiry*, 29 Harv. J.L. & Pub Pol'y 103, 117–19 (2005) (explaining the drafters' rejection of a system in which only the Senate had the power to veto nominations); Matthew C. Stephenson, *Can the President Appoint Principal Executive Officers without a Senate Confirmation Vote?*, 122 Yale L.J. 940, 964–95 (2013). The Clause's function is thus fulfilled once an opportunity for the Senate to act has come and gone.

So if recess includes intrasession breaks, then we would expect the recess-appointment term to last only until the end of *that* session. This is because once the Senate returned from its break there would be an opportunity to undergo the normal process. Yet the Constitution provides that the term would last until the end of the *next* session. This suggests that the durational provision contemplates a meaning of recess that means intersession breaks only.

This is best seen in the process of recess

appointments that results under each definition of recess. Under the intersession-only definition, the president would make a recess appointment between sessions of the Senate, which ensures the continued operation of the government even though the Senate has not considered the president's selection. Once the Senate begins its "next Session" by reconvening, the primary appointments process becomes available and—because the Constitution requires joint appointment authority—must be undertaken by the Senate and the president. However, to allow the operation of government to continue, the Senate has until the end of this session to consider the president's selection and confirm or deny it. And if the body does not act or denies that appointment, then the recess appointment ends because the constitutional requirement of joint agreement has not been reached. Through this process, the Appointments Clause retains its primacy as the preferred constitutional method of appointing officers, while the Recess Appointments Clause retains its auxiliary role that allows the president to fill positions when the ordinary process is unavailable.

Under an intrasession definition, the Clause would no longer have an auxiliary role. The president would make the recess appointment during a break within a Senate session. But the Senate's reconvening and first subsequent adjournment—whether that be for a long intrasession break or for the intersession break—would have no immediate effect on the recess appointment

because the appointment lasts until the "next Session," as demarked by adjournments *sine die*. The appointment would not expire until the Senate reconvened, adjourned *sine die*, reconvened, and then adjourned *sine die* a second time. Thus, the appointment would continue even though the opportunity to undergo the ordinary, preferred process had come and gone. This shows that when the intrasession definition of recess is combined with the durational provision, a fundamentally different relationship between the clauses is created: the intrasession definition makes the Recess Appointments Clause an additional rather than auxiliary method of appointing officers.

The durational provision thus indicates that the most natural reading of the Clause defines recess to mean intersession breaks only. *Cf. Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32 (1973) ("It is well established that our task in interpreting separate provisions of a single Act is to give the Act the most harmonious, comprehensive meaning possible in light of the legislative policy and purpose." (internal quotation marks omitted)); *Gustafson v. Alloyd, Inc.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps. This rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words"). This is supported by the fact that the original Senate Vacancies Clause used a different durational provision: "the next

Meeting." U.S. Const. art. I, § 3, cl. 2, *superseded by id.* Amend. XVII.[27] The original language shows that the durational provision in the Recess Appointments Clause could have been phrased in a manner that would have allowed the Senate and president only one opportunity to undergo the ordinary process if recess instead included intrasession breaks. By setting the duration to the "next Meeting," it becomes irrelevant what type of break the legislature took because once it convenes, the appointment expires and the legislature must act.[28] That

---

[27] The Senate Vacancies Clause stated in full:

> [I]f Vacancies [in the Senate] happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.

U.S. Const. art. I, § 3, cl. 2, *superseded by id.* Amend. XVII.

[28] Correspondingly, this could mean that the break before that meeting—i.e., "the Recess of the Legislature"—did not necessarily have to be an intersession break. If this is the case, it is unlikely that recess was used in the same manner in the Senate Vacancies Clause as it is in the Recess Appointments Clause. Some words in the Constitution have different meanings "according to the

the Clause uses "next Session" rather than "next Meeting" thus shows that recess contemplates a particular type of break. And, in light of the competing operations of the definitions, that type is the intersession break.

The Board disagrees with this characterization. It argues that the duration provision conforms with an intrasession definition of recess because if recess appointees' tenures did not extend until the end of the next session, then the Senate would lack an opportunity to consider a recess appointee when an intrasession break coincides with the end of a session. NLRB Ltr. Br. at 12–13. After all, if the appointment lasted until the end of the Senate's session, and the intrasession break in which he was appointed lasted until the end of *that* session, then the appointee's term would expire at the end of that break and the Senate would not have a chance to consider the appointment. So, according to the Board, fixing the duration to the *next* session might ensure that the Senate has an opportunity to provide its advice and consent.

---

connection in which [they are] employed" and "the character of the function" in which the word is found. *Atlantic Cleaners & Dryers v. United States*, 286 U.S. 427, 433–34 (1932). The different meanings of recess would likely be necessary here to account for varying state procedures that may or may not have had formal sessions similar to the Senate.

This argument is unpersuasive for two reasons. First, the problem arises only if one adopts an intrasession definition of recess. If recess is limited to intersession breaks, then there will never be any doubt that the Senate will have its single chance to weigh in: once it reconvenes for its next session. Avoiding this problem is yet another reason to define recess to mean intersession breaks. *Cf. Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) (explaining that "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible").

Second, we acknowledge that the durational provision can be read consistently with an intrasession definition. But the Board's point does not show that the most natural reading of the Clause's duration provision supports this definition. Instead, it tends to show the opposite. We doubt that the phrase "next Session" is intended to address an unusual situation—one that the drafters' of the Constitution were unlikely to contemplate. An intrasession break has extended until the end of one of the Senate's 296 completed sessions only once, in 1992. (And even if we were to adopt the Board's contention that *pro forma* sessions constitute a recess— which we do not—then the number increases to three times, in 2008 and 2011).[29] In other words, if fixing the

---

[29] The Official Congressional Directory records fourteen sessions of *Congress* that have ended within a day of the

82

Constitution's automatic termination date. *See* Congressional Directory for the 112th Congress 522–38 (2011). This directory was completed before the end of the 2011 session of Congress, so the inclusion of the session that ended on January 3, 2012, brings the total to fifteen. A session automatically ended the first Monday of December until the Twentieth Amendment changed it to January 3 in 1933. U.S. Const. art. I, § 4, cl. 2; Amend. XX. These are the only relevant terminations of Senate sessions because if the Senate ends their session by convening and then adjourning *sine die*, then the Senate has a chance to consider nominations while they are convened. For example, in 2003, the Senate had an intrasession break that lasted from November 25 until December 9. 149 Cong. Rec. 31985 (Nov. 25, 2003) (statement of Sen. McConnell). On December 9, they convened and adjourned *sine die*. 149 Cong. Rec. 32404 (Dec. 9, 2003) (statement of Sen. Frist). The Board points to this as one example of a session ending before the Senate has the chance to consider a president's recess appointments. NLRB Ltr. Br. at 12–13. But, even though the recess ended on the same day the session did, when the Senate convened to adjourn *sine die* they conducted quite a bit of business—including the confirmation of fifty-two people as officers of the United States. 149 Cong. Rec. at 32404–05.

Only in one instance has an intrasession break ended at the same time that a Senate session has. *See* 137 Cong.

83

Rec. 36362–64 (Nov. 27, 1991 through Jan. 3, 1992) (recording the Senate's November 27, 1991 adjournment until January 3, 1992). Even there, however, the Senate still convened before the session ended and had the opportunity to conduct business if it had wanted to. For example, it received messages from the president regarding nominations, though it did not confirm anyone before adjourning *sine die*. *See* 137 Cong. Rec. at 36364.

Two were preceded by a series of *pro forma* Senate sessions. *See* 157 Cong. Rec. S8783–84 (daily ed. Dec, 17, 2011) (recording the unanimous consent agreement to a schedule of *pro forma* session); 154 Cong. Rec. 24802–08 (Dec. 12, 2008; Dec. 12, 2008; Dec. 16, 2008; Dec. 19, 2008; Dec. 23, 2008; Dec. 26, 2008; Dec. 30, 2008; Jan. 2, 2009) (holding a series of *pro forma* sessions from Dec. 13, 2008 through Jan. 2, 2009).

Eleven were preceded by the Senate conducting business. *See* 158 Cong. Rec. S8637–68 (daily ed. Jan. 2, 2013) (confirming presidential nominees and completing business from days immediately prior before adjourning pursuant to the Constitution); 141 Cong. Rec. 38549–38608 (Dec. 29, 1995; Dec. 30, 1995; Jan. 2, 1996; Jan. 3, 1996); 116 Cong. Rec. 43999–44129, 44346–44597 (Dec. 30, 1970; Dec. 31, 1970; Jan. 2, 1971) (adjourning *sine die* one day before the constitutional deadline of January 3 after completing business); 96 Cong. Rec. 17022–17121 (Jan. 2, 1951) (same); 87 Cong. Rec.

84

duration until the Senate's next session (rather than the end of that session) is meant only to ensure the Senate has a chance to provide its advice and consent without regard to its effect on the broader framework, then the duration provision's purpose has only become important

---

10138–10143 (Dec. 26, 1941; Dec. 30, 1941; Jan. 2, 1942) (same); 86 Cong. Rec. 13997–14000, 14003–07, 14011–46, 14058–59 (Dec. 26, 1940; Dec. 30, 1940; Jan. 2, 1941; Jan. 3, 1941) (conducting business several days before the session terminated by function of the Constitution on January 3, 1941); 63 Cong. Rec. 440–48, 450–52 (Dec. 2, 1922; Dec. 4, 1922) (conducting business on the first Monday of December, and the days preceding it, before adjourning *sine die* as required by the Constitution); 50 Cong. Rec. 6030–37, 6041–44, 6050–53 (Nov. 26, 1913; Nov. 29, 1913; Dec. 1, 1913) (same); 37 Cong. Rec. 520–25; 529–31; 542–44 (Dec. 4, 1903; Dec. 5, 1903; Dec. 7, 1903) (same); 6 Cong. Rec. 764–98, 799–805, 816–17 (Nov. 30, 1877; Dec. 1, 1877; Dec. 3, 1877) (same); 38 Cong. Globe, 40th Cong., 1st Sess. 793–95, 802, 810–11, 816–17 (Nov. 26, 1867; Nov. 27, 1867; Nov. 29, 1867; Dec. 2, 1867) (same).

And one of these terminations of Congress's session was due to continued business by the House, even though the Senate had adjourned *sine die* earlier. *See* 125 Cong. Rec. 37605–06 (Dec. 20, 1979) (recording the Senate's *sine die* adjournment on December 20, 1979).

85

one time. And even during this recent instance, the Senate convened before their constitutionally imposed deadline and could have considered nominations if they had chosen to do so. *See* 137 Cong. Rec. 36364 (Jan. 3, 1992). The complete absence of the problem described by the Board in the last 225 years suggests that the Constitution most likely was not written with such a problem in mind. *Cf. Marozsan v. United States*, 852 F.2d 1469, 1498 (7th Cir. 1988) (en banc) (Easterbrook, J., dissenting) ("The terror of extreme hypotheticals produces much bad law."). This implies that the durational provision was most likely written simply to reinforce the auxiliary nature of the Recess Appointment Clause by limiting recess appointees' terms to last only as long as necessary to afford the Senate one opportunity to undergo the ordinary process.

The Constitution thus shows that the more limited definition of recess—that is necessitated by the purpose of the Recess Appointments Clause and the adjournment-recess dichotomy—includes only intersession breaks. Nothing within the broader context of the Constitution supports the Board's definition. As for the intersession-plus-long-intrasession definition, although it could conform with the relationship between the Clauses, there is no constitutional basis for defining "long" and the definition is unsupported by the other relevant

constitutional provisions.[30] The relationship between the

---

[30] The dissent argues that our interpretation of recess reads the modifier "intersession" into the Constitution, contrary to the Supreme Court's admonition to avoid doing so. Dissenting Op. at 12–14. This misunderstands our reasoning. As we have shown, the ordinary meaning of recess could support any of the definitions asserted, including the intersession definition. Through analysis of historical usage, application of the Recess Appointment Clause's purpose, and analysis of the relevant constitutional context, we hold that of the ordinary meanings, the Constitution uses the intersession definition of recess. In short, we do not read "intersession" into the Constitution because—as the word is used in the document—"recess" means only intersession breaks.

This method is also seen in the dissent's reasoning, which defines recess to mean when the Senate is unavailable to provide its advice and consent. *Id*. at 2. Per the dissent's logic, Judge Greenaway's definition would read the Clause to be "the Recess of the Senate [in which it cannot provide its advice and consent]." This is best illustrated by the dissent's acknowledgement that the Senate recesses when it goes to lunch but that these recesses do not fall within "Recess" as it is meant in the Constitution. *Id*. at 8–10. Adding "in which it cannot provide its advice and consent" to the Clause is not what we understand the dissent to do. Instead, our colleague

Appointments Clauses, the duration of recess appointments, and the Constitution's use of adjournment elsewhere all show that "the Recess of the Senate" includes only breaks between sessions of the Senate.

C.      Historical Practice

Our conclusion is supported by early historical practice. From ratification until 1921, there was a rough consensus that recess appointments could be made only during intersession breaks. *See* Rappaport, *supra*, at 1572–73. Before 1867, no president made a recess appointment during an intrasession break of the Senate. *Id*.; Hartnett, *supra*, at 408–10. In 1867 and 1868, President Andrew Johnson made several recess appointments during intrasession breaks of the Senate. Hartnett, *supra*, at 408–10. His use of the appointments powers, however, was a cause of significant turmoil at the time and it served a not insignificant role in his eventual impeachment. *Id*. at 409; Rappaport, *supra*, at 1572. Accordingly, it is unclear whether President Johnson's actions were based on a consensus view of the Constitution. There is evidence that it was not. U.S.

_____

argues that recess itself means moments in which the Senate cannot provide advice and consent. While we disagree with this conclusion, both the majority opinion and the dissent are engaged in the same task—defining the word "recess."

Attorney General Philander Knox—the first attorney general to directly address the meaning of recess—advised President Theodore Roosevelt that he could *not* make a recess appointment during intrasession breaks. 23 U.S. Op. Att'y Gen. 599, 604 (1901). For over one-hundred years following ratification, recess was generally understood to mean intersession breaks only.

To be sure, this practice arose when intrasession breaks were generally no longer than two weeks. Rappaport, *supra*, at 1572; Hartnett, *supra*, at 410. But that is no reason to discount the practice. As modern practice has shown, it is sometimes in the interest of presidents to make recess appointments during breaks as short as two weeks. *See, e.g.*, *Evans*, 387 F.3d at 1221 (describing President George W. Bush's recess appointment of Judge William Pryor to the Eleventh Circuit during an eleven-day intrasession break). That presidents did not assert this power for over 100 years—despite this interest—suggests that they do not, in fact, have this power. *Cf. Printz v. United States*, 521 U.S. 898, 907–08 (1997) (explaining that an absence of examples of Congress "impress[ing] the state executive into its service . . . suggests an assumed *absence* of such power" (emphasis in original)); *see also Noel Canning*, 705 F.3d at 502.

Executive practice changed in 1921 when President Warren Harding made an intrasession recess appointment. Michael A. Carrier, Note, *When is the*

*Senate in Recess for Purposes of the Recess Appointments Clause?*, 92 Mich. L. Rev. 2204, 2235 (1994). As explained above, this act was supported by U.S. Attorney General Daugherty, who reversed the opinion offered by Attorney General Knox a mere twenty years earlier. 33 U.S. Op. Att'y Gen. at 21–22. Attorney General Daugherty explained that "whether the Senate has adjourned or recessed . . . is whether in a *practical* sense the Senate is in session so that its advice and consent can be obtained." *Id*. This conclusion was based on a Senate Judiciary Committee report, which argued that practical considerations should prevent a president from using his recess-appointment power during intersession breaks that last mere seconds. *Id*. at 24. From this report, he drew the practical considerations that the Board urges us to adopt today, explaining that the Senate is not in session when its members have no duty to attend, the chamber is empty, and the Senate cannot receive communications. *Id*.

Importantly, Attorney General Daugherty explicitly rejected the "all recesses" implication of this test. He recognized that the practical considerations identified could allow presidents to use their power for "an adjournment for only 2 instead of 28 days" but rejected the idea that 2 days were sufficient to constitute a recess within the meaning of the Constitution. *Id*. at 24–25 (answering "unhesitatingly" that two days did not amount to a recess). He explained that not "even 10

90

days can be said to constitute the recess intended by the Constitution." *Id.* at 25. As discussed above, though, this suggestion of ten days is not linked to any text in the Constitution.

Since issuance of Attorney General Daugherty's opinion, the executive has claimed the authority to recess appoint officers during intrasession breaks. Before World War II, however, the power was used only one other time. Carrier, *supra*, at 2211–12. After World War II, intrasession appointments remained relatively rare for some time: President Harry Truman made twenty, President Dwight Eisenhower made nine, President Richard Nixon made eight, and President Jimmy Carter made seventeen; but Presidents John Kennedy, Lyndon Johnson, and Gerald Ford made none. *Id.* at 2212–13. The practice grew dramatically under President Ronald Reagan, who made 73 intrasession appointments, and it has seen significant use ever since: President George H.W. Bush made 37, President Bill Clinton made 53, and President George W. Bush made 141; President Barack Obama made 26 as of January 5, 2012. *Id.* at 2214–15; Henry B. Hogue et al., Cong. Research Serv., *The* Noel Canning *Decision and Recess Appointments Made from 1981–2013* *4 (2013). Thus, it has been only over the last thirty years that presidents began relying so heavily on such recess appointments.

Notably, this relatively recent practice supports only an intrasession definition that is associated with a

long duration. It does not support the Board's functionalist definition. The executive has maintained from 1921 until 2012, at least in practice, that a certain number of days must pass before an intrasession appointment could be made. *See* Carpenter et al., *supra*, at 15 ("The length of the recess may be of great importance, as it appears that no President, at least in the modern era, has made an intrasession recess appointment during a recess of less than 10 days."); *see also* 36 Op. O.L.C. *1 (Jan. 6, 2012) ("This Office has consistently advised that a recess during a session of the Senate, at least if it is sufficient length, can be a 'Recess.'" (citation and internal quotation marks omitted)). The Board now seeks to abandon this limitation, which is completely unsupported by modern practice.

More important, however, recent practices cannot alter the structural framework of the Constitution. The Eleventh Circuit relied on a presumption that actions by the president are constitutional. *Evans*, 387 F.3d at 1222.[31] We doubt that the presumption applies in

---

[31] The Eleventh Circuit also implicitly derives this presumption from the framework explained by Justice Jackson in *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952). *See Evans*, 387 F.3d at 1222. *Evans* does not discuss *Youngstown*, but it cites *United States v. Allocco*, 305 F.2d 704, 713 (2d Cir. 1962), as support for the presumption. *Evans*, 387 F.3d

separation-of-powers cases. In *Clinton v. New York City*, 524 U.S. 417 (1998), for example, the Supreme Court analyzed the constitutionality of the line-item veto without ever expressing the need to defer to the other

at 1222. *Allocco*, in turn, relies on *Youngstown* to defer to executive practice regarding the meaning of "happens" in the Recess Appointments Clause. 305 F.2d at 713–14. Specifically, *Allocco* relied on *Youngstown* by using it as support for its interpretation of "happen" since the Second Circuit believed its interpretation as "'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned,'" which "'may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II.'" *Id.* (quoting *Youngstown*, 343 U.S. at 610–11). While we are unsure whether the executive practice before the *Allocco* Court regarding the meaning of "happen" is actually "systematic" and "unbroken," we are sure that the executive practice regarding the meaning of "the Recess of the Senate" is not. As discussed, the modern executive practice is contrary to executive practice before 1921 and has only become commonly used in the past thirty years. Furthermore, Congress has questioned presidents' practices by, for example, holding *pro forma* sessions in an effort to stop it. We consider the Eleventh Circuit's reliance on *Allocco* as support for a presumption of constitutionality in separation-of-power cases unpersuasive.

branches' constitutional judgments. And in *Morrison v. Olson*, 487 U.S. 654 (1988), Justice Scalia noted in his dissent that one could "not find anywhere in the Court's opinion the usual, almost formulary caution that we owe great deference to Congress' view that what it has done is constitutional." *Id*. at 704–05 (Scalia, J., dissenting). The absence of deference is also found in the Supreme Court's most recent separation-of-powers case, *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010). There, the Court pointedly explained that "the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'" *Id*. at 3155 (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)). This is because "[t]he Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York*, 505 U.S. at 182.

The lack of deference to executive and legislative judgments on these issues follows from the fact that "separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch." *Freytag*, 501 U.S. at 878. Giving deference to either branch is inconsistent with this concern because a presumption could prevent us from stopping one branch from "aggrandizing its power at the

94

expense of another branch," or ensuring that "the carefully defined limits on the power of each Branch" are not eroded, *Chadha*, 462 U.S. at 957–58. Our role as the "ultimate interpreter of the Constitution" requires that we ensure its structural safeguards are preserved. *Baker*, 369 U.S. at 211. It is a role that cannot be shared with the other branches anymore than the president can share his veto power or Congress can share its power to override vetoes. *See United States v. Nixon*, 418 U.S. 683, 704–05 (1974). This "requires that [we] on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch." *Powell v. McCormack*, 395 U.S. 486, 549 (1969).

The Supreme Court has stated as much in respect to the appointments provisions of the Constitution. In *Freytag*, the Supreme Court explained that the Appointments Clause represents an independent restraint on both branches—one that does not exclusively serve either branch's interests. 501 U.S. at 880. This is equally true for the Recess Appointments Clause: just as "[t]he structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic," *id.*, the structural protections of the Recess Appointments Clause belong to no single branch. Accordingly, "[t]he assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review." *Id.* (quoting *Chadha*, 462 U.S. at 942 n.13). This applies equally to

95

the legislature's assent to executive practice. Any acquiescence between the branches remains subject to the constraints imposed by the Constitution. There is "no statute of limitations for interpreting and enforcing the Constitution." *Evans*, 387 F.3d at 1237 (Barkett, J., dissenting).

Furthermore, our analysis of recent practice is "sharpened rather than blunted by the fact that [the practice in question is] appearing with increasing frequency." *Chadha*, 462 U.S. at 944. Our analysis has shown that defining recess to mean intersession plus long intrasession breaks is incompatible with the Constitution. Although this definition is consistent with one possible meaning of "recess" in isolation, it is unsupported by the rest of the Constitution. The Constitution provides no measure of a "long" duration and limits the duration of recess appointees' terms in a manner that indicates an intersession-only definition. This means that the current practice is contrary to the structural framework set out in the Constitution and must be held unconstitutional.

D.    Additional Considerations

Our conclusion that recess includes only intersession breaks is supported by the Supreme Court's direction that "the doctrine of separation of powers is a *structural safeguard*" which has as one of "its major feature[s]" the "establish[ment] [of] high walls and clear distinctions because low walls and vague distinctions will

not be judicially defensible in the heat of interbranch conflict." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) (emphasis in original). This bolsters our rejection of the Board's definition because the unavailable-for-business criteria are almost by definition a "low wall" that contain "vague distinctions" which will make them difficult for the Senate and the president to predictably apply. The vagueness of the Board's definition is perhaps best captured by its argument that the Senate is not available for business during *pro forma* sessions even though there are documented examples of the Senate conducting business during such sessions. Its definition thus falls far short of containing the "major feature" of separation-of-powers structural safeguards.

This is also true for the intrasession definition that limits recess to long breaks. This definition is not "judicially defensible" because whatever duration is selected as long would be based on something other than the Constitution. *See Maryland v. Shatzer*, 559 U.S. 98, __, 130 S. Ct. 1213, 1228 (2010) (Thomas, J., concurring in part, dissenting in part) (explaining that "an otherwise arbitrary rule is not justifiable merely because it gives clear instruction"). Furthermore, although an arbitrary number of days at first seems to erect a high wall and clear distinction, further review reveals that it is also fraught with ambiguity. For example, if we were to hold that an intrasession break of over ten days constitutes a recess, it is unclear at which point the adjournment

evolves into a recess. Assume the Senate initially agrees to adjourn for twelve days but provides the majority leader the power to recall the body earlier, as it often does. *See, e.g.*, H. Con. Res. 307, 111th Cong. (2010) (providing the House of Representative's concurrence with the Senate that the latter would take a month-long recess starting in August 2010 that ended on September 13, 2010 unless "[t]he Majority Leader of the Senate . . . , after consultation with the Minority Leader of the Senate, shall notify the Members of the Senate to reassemble at such place and time as he may designate if, in his opinion, the public interest shall warrant it"). Does this adjournment become a recess at the moment the Senate votes for the adjournment or must ten days first elapse? If the former, then assume the majority leader reconvenes the body after eight days of the adjournment. At this point, would a recess appointment made on the first day of the adjournment become invalid because it was not made during "the Recess" of the Senate? The Constitution provides no clear answer to these difficult questions. The long-intrasession break definition thus lacks the clear distinctions required by the Supreme Court, which means that the intersession definition is the only one that provides high walls and clear distinctions rooted in the text of the constitution.

The Board nevertheless argues that the rule we adopt today creates too powerful an opportunity for

mischief by the Senate.[32] The intersession definition

---

[32] The dissent makes a form of this argument as well, arguing that the intersession-break definition of recess is "unworkable," "not judicially manageable," impracticable, and leads to absurd results. Dissenting Op. at 52–54. We disagree that the definition is unworkable, unmanageable, or impracticable; whether a break is intersession or not is a simple matter of reviewing how the Senate has adjourned. We also disagree that the result of a president's recess appointment being valid one day and not the next is absurd, *id.* at 53–54, because this is a necessary result of defining recess. The dissent's own definition, for example, would have this effect: a presidential recess appointment presumably would be valid on January 22, 2012, because the Senate did not convene at all on that day, *see* 158 Cong. Rec. S11 (Jan. 20, 2012) (adjourning until Monday, January 23, 2012); but be invalid if made on January 23, 2012, because the Senate became available by convening for a non–*pro forma* session, 158 Cong. Rec. S13 (daily ed. Jan. 23, 2012). Absurdity is also not clearly shown from the intersession-break definition's allowance of recess appointments during intersession recesses that last very short periods. *Id.* at 54. It is a result that has been rejected only by one 110-year-old Senate Committee Report—no president, court, or scholar has rejected the possibility. *Cf.* Hartnett, *supra*, at 406 ("All agree that recesses

allows the Senate to prevent the president from exercising his recess-appointment powers by manipulating the timing and the types of its adjournments. *See* NLRB Ltr. Br. at 10–11. This is true. But the opportunity for abuse is present under any possible definition of recess. Under the Board's definition, the Senate might avoid being in recess by stopping the practice of agreeing by unanimous consent that no business will be done during *pro forma* sessions; or it might alter its procedures to allow messages to be received during such sessions, thus making itself available for business under the Board's definition, *see* Resp. Br. at 44. And under the other intrasession definition, the Senate could very well adopt scheduling orders that prevent a break from lasting longer than whatever duration courts selected—as, in fact, *pro forma* sessions are designed to do. Yet the potential for abuse is not limited to the Senate, as presidents may also abuse any definition given to recess. Under the intersession definition, as a final example, presidents still could recess appoint (and indeed have so appointed[33]) officers during

---

between sessions . . . give rise to the President's recess appointment power.").

[33] Hartnett, *supra*, at 416 & nn.176–77 (describing President Theodore Roosevelt's recess appointment of 160 officers during an intersession break that lasted mere seconds).

100

intersession breaks that last negligible periods of time—the lack of a constitutional basis for selecting a long duration in defining intrasession breaks is just as absent to define intersession breaks.

All this is to say that the potential for abuse and subsequent gridlock lies not in what recess means but in the Constitution's framework of divided powers. A division of powers demonstrates that "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Chadha*, 462 U.S. at 944. We, as federal judges, are not empowered to regulate, recommend, or comment on *how* the two other branches of the federal government should use the powers the Constitution allocates between them—not because we can-but-chose-not-to, but because we lack the factual record, institutional tools, and constitutional authority to evaluate which branch is more or less likely to abuse the powers given to them. We can, however, and indeed we must, decide *what* powers each branch has and *when* they may use them because "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). That is all we do today.

## VI

Member Becker was invalidly recess appointed to the Board during the March 2010 intrasession break. This means that the delegee group had fewer than three

members when it issued the August 26 Order. Consequently, the delegee group acted without power and lacked jurisdiction when it issued the order. Our holding makes it unnecessary to interpret the word "happen" in the Recess Appointments Clause. *Accord Noel Canning*, 705 F.3d at 515 (Griffith, J., concurring).[34] Furthermore, we need not address whether the Board's substantive decision was correct or whether the delegee groups that decided the subsequent reconsideration orders were properly composed. *Dir., Office of Workers' Compensation Programs v. Sun Ship, Inc.*, 150 F.3d 288, 291 (3d Cir. 1998). Review of the reconsideration orders is also unnecessary because they were based on consideration of an invalid order. We will therefore vacate the Board's orders.

---

[34] Accordingly, we do not have to address the conflict between the Second, Ninth, and Eleventh Circuits and the D.C. Circuit over the definition of "happen." *Compare United States v. Allocco*, 305 F.2d 704, 709–12 (2d Cir. 1962) (defining "happen" to mean "to exist"; *United States v. Woodley*, 751 F.2d 1008, 1009–13 (9th Cir. 1985) (same); *Evans*, 387 F.3d at 1226–27, *with Noel Canning*, 705 F.3d at 507–14 (defining "happen" to mean "to occur").

GREENAWAY, JR., *Circuit Judge*, dissenting.


The tension between the branches of our government reflects the brilliance and prescience of our Founding Fathers and is the foundation of our nation's democracy. Who may exercise power, and under what circumstances, is often dependent on our branches' interpretation of the wording and meaning of the Constitution. In this matter, the Recess Appointments Clause of Article II is at issue. My colleagues in the Majority have determined that the recess appointment of Member Craig Becker on March 27, 2010 is invalid and, for the same reasons, would presumably find that the recess appointments of Members Sharon Block, Terence Flynn, and Robert Griffin on January 4, 2012 are likewise invalid. The Majority's rationale undoes an appointments process that has successfully operated within our separation of powers regime for over 220 years.

In defining the scope of the Recess Appointments Clause, the critical issue is more straightforward than the Majority suggests: The issue is whether "the Recess" includes only intersession recesses (those between two regular sessions of Congress) or intersession recesses and intrasession recesses (those within a regular session of Congress).[1] The Majority's three possible definitions of "Recess" can be distilled into one question: Are intrasession recesses included within the ambit of "the Recess"? I would hold that "the Recess" refers to both intrasession and intersession recesses because the Senate

---

[1] No party argues that "the Recess" should be limited only to intrasession recesses, and neither do I.

can be unavailable to provide advice and consent during both. The availability of the Senate to provide advice and consent is the crux of the Recess Appointments Clause because its operation depends on its complementary interplay with the Appointments Clause, which requires that the Senate be available to provide advice and consent.

The plain meaning and structure of the text of the Constitution, the intent of the Framers, the purpose of the Recess Appointments Clause, and the tradition and practice of the branches of our government all demand this result. Any interpretation of the Recess Appointments Clause is incomplete without consideration of the executive power and the system of separation of powers devised by the Framers, and such consideration leads to the pragmatic conclusion that the President must be able to make recess appointments during intrasession recesses. Since the March 27, 2010 recess appointment of Member Becker and the January 4, 2012 recess appointments of Members Block, Flynn, and Griffin were all made during intrasession recesses, I would hold that each appointment was a valid exercise of the executive power granted to the President in the Recess Appointments Clause of Article II of the Constitution.[2] I respectfully dissent.[3]

---

[2] Given the procedural posture on appeal and the Majority's holding, resolving the merits of whether New Vista's Licensed Practical Nurses (LPNs) are supervisors is unnecessary at this time.

[3] I also disagree with the Majority's conclusion that the group quorum requirement (what I believe the Majority refers to as the "three-member-composition" requirement) is jurisdictional. In *New Process Steel, L.P. v. NLRB*, 130 S. Ct.

2

# I. "THE RECESS"

## A. The Text of the Constitution

Our examination of the Recess Appointments Clause is dependent on the interpretation of two words: "the Recess". This examination then begs two inquiries: 1) the meaning of "Recess" within the Recess Appointments Clause and 2) the significance of "the", a definite article, as a modifier. Recesses fall into two general categories, intersession and intrasession, and so unraveling the meaning of "Recess" begins and ends with resolving the intersession-intrasession dynamic. The Majority posits that this dichotomy contemplates that intersession breaks and intrasession breaks are both recesses by the Senate that have contrasting effects on the President's ability to make recess appointments. I disagree.

As a starting point in defining a "recess", it is helpful to define a "session" since the two terms are related. There are various types of sessions, including the "daily sessions" of Congress, during which it conducts its day-to-day business, as well as its "regular sessions", which are the periods during which Congress conducts its business on a regular basis. In addition to these sessions, there are also "extraordinary sessions" of Congress that can be called by the President under Article II.[4]  U.S. Const. art. II, § 3.  And, since the

---

2635 (2010), the Supreme Court does not use the word "jurisdictional", or any variant thereof, and did not characterize the § 153(b) requirement as jurisdictional.

[4] The Majority's definition of an intersession recess also includes recesses preceding and following extraordinary and

3

House and Senate are not required to match schedules, the session or recess of one body may be different than that of the other.

Based on the definition of a regular session, recesses can be divided into the two mentioned categories of breaks, intersession recesses and intrasession recesses. Intersession recesses are those breaks of the Senate that occur between two regular sessions of the Senate; they are generally initiated by an adjournment sine die. *See* Henry B. Hogue, Cong. Research Serv., *Recess Appointments: Frequently Asked Questions* 1-2 (Jan. 9, 2012). Intrasession recesses are breaks that occur during a regular session of the Senate. It had been suggested that Congress cannot be in a recess and in a regular session concurrently, but the Supreme Court has rejected this conclusion. *Wright v. United States*, 302 U.S. 583, 589 (1938) ("Plainly the taking of such a recess [by one house] is not an adjournment by the Congress. The 'Session of Congress' continues."); *see also Evans v. Stephens*, 387 F.3d 1220, 1225 (11th Cir. 2004) (en banc). From this, it is possible for one house to recess while the session of the Congress, as a joint body, continues.[5]

---

special sessions of Congress, but such a holding is beyond the facts of our case. *See* Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 408 n.136, 414-15 (2005).

[5] For one, the regular session of the Senate does not end when it takes an intrasession recess. *See generally* Congressional Directory for the 112th Congress (2011) (showing that the dates of intrasession recesses occur within the dates spanning

4

To begin our textual analysis, the Recess Appointments Clause must be read in conjunction with the Appointments Clause. While the Majority also reads these two clauses together, it takes a shortsighted view of their interrelation. The Majority contends that the Appointments Clause gives the President a "perpetual" power to seek the advice and consent of the Senate. (Majority Op. at 58-59.) The Majority also contends that the Appointments Clause suggests a preference for "divided power" in the appointments process. I could not agree more with the Majority that every facet of the appointments process must reinforce the separation of powers, but the Majority's view is too narrow. While the Recess Appointments Clause gives the President sole authority to make appointments during the "Recess" of the Senate, the Recess Appointments Clause maintains the separation of powers within the larger framework of the appointments process. In The Federalist No. 67, which the Majority relies upon for this point, Alexander Hamilton emphasized that the recess appointment power was only a supplement to the advice and consent power of the Senate. The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The Majority misinterprets Hamilton's point. The supplemental nature of the Recess Appointments Clause helps to maintain the separation of powers by preventing the President from holding the entire power to appoint in his hands.

---

the convening date and adjournment date of regular sessions of the Senate). For another, the House and the Senate, as one Congress, generally share the same regular session and the recess of one body, such as the Senate, does not interrupt the regular session of the House and Congress as a whole.

5

The Appointments Clause provides that a nominee may only be presented by the President but, on the other hand, may only be confirmed to office with the advice and consent of the Senate. The Recess Appointments Clause thereafter provides an alternate means of confirming nominees when the Appointments Clause cannot be implemented, namely when the Senate cannot provide advice and consent to the President. After all, the Appointments Clause and Recess Appointments Clause cannot both operate simultaneously — one means of appointment must be used or the other. Thus, it can be adduced that the meaning of "the Recess" is the converse of when the Senate can provide advice and consent to the Senate: The Senate is in "the Recess" when it is not available to provide advice and consent. *See Noel Canning v. NLRB*, 705 F.3d 490, 505 (D.C. Cir. 2013) (observing that there is "a crucial element of the [Recess Appointments] Clause, which enables the President to fill vacancies *only when the Senate is unable to provide advice and consent*" (emphasis in original)). Since the Senate can be unavailable to provide advice and consent during either an intrasession recess or an intersession recess, "the Recess" naturally encompasses both types of recesses. To provide advice and consent, the Senate must be able to offer a confirmation vote on nominees, be it up or down.[6]

---

[6] This segues to an inherent weakness in restricting "the Recess" to intersession recesses. The House was largely responsible for the pro forma sessions because it refused to let the Senate take a longer recess due to the Adjournments Clause's requirement that the House and Senate have the other body's consent to "adjourn for more than three days." U.S. Const. art. I, § 5, cl. 4; Office of Legal Counsel,

*Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions*, 36 Op. O.L.C. 1, 2-3 (2012).  Without doubt, the Framers did not intend for the House to single-handedly stall the appointments process.  The plain and uncontestable text of the Appointments Clause makes it clear that only the President and the Senate are to consult on appointments.  Nowhere in the Appointments Clause is the House mentioned.  If "Recess" were limited to intersession recesses, because that is the only time when the Senate is not in a regular session, and the Senate is always available to provide advice and consent when in a regular session, then the House would be allowed to inject its whims into the appointments process by limiting even the duration of the intersession recess.  This is because an adjournment of more than three days requires the imprimatur of the House under the Adjournments Clause.  After all, the purpose of the Adjournments Clause is to make sure that one house of Congress cannot abandon the other in the legislative process, and the House cannot legislate with the Senate if it is not in session.  *See* Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 379 (2005).  If the Recess Appointments Clause was only triggered when the Senate ended a regular session, then a recess appointment made during an intersession recess of at least three days would effectively be subject to the approval of the House.  The House could simply deny the Senate leave to adjourn in order to thwart the President's ability to make recess appointments.  In at least the last thirty years, the President has never made a recess appointment, of either the intersession or intrasession variety, during a recess of less than ten days.  *See* Henry B. Hogue, Cong. Research Serv.,

7

While courts have not had occasion to articulate a standard for advice and consent, it is clear through the plain meaning of "advice and consent" that the provision of advice and consent cannot be perfunctory. It is only reasonable to require that there must be a deliberative process ("advice"), a vote ("consent"), and a quorum of Senators actually present in the Senate chamber. *See* Elizabeth Rybicki, Cong. Research Serv., *Senate Consideration of Presidential Nominations: Committee and Floor Procedure* 10 (July 1, 2003) ("A majority of Senators present and voting, a quorum being present, is required to approve a nomination."). It is no secret that the advice and consent process is a long and arduous ordeal. *See Noel Canning*, 705 F.3d at 508 (calling the advice and consent process "cumbersome"). Various forms of "vote" are used frequently elsewhere in the Constitution, so the Framers would not have used "Advice and Consent" if they only intended for nominees to be confirmed by a vote.[7]

---

*Recess Appointments: Frequently Asked Questions* 3 (Jan. 9, 2012). Based on that empirical data, it is highly improbable that, under these circumstances, the President would make a recess appointment without needing the House's approval. This cannot be what the Framers intended. *See Noel Canning*, 705 F.3d at 504 ("Without any evidence indicating that [the Recess Appointments Clause and Adjournments Clause] are related, we cannot read one as governing the other. We will not do violence to the Constitution by ignoring the Framers' choice of words.").

[7] As for a presence requirement, "presence" is not mentioned in the Appointments Clause but it is mentioned explicitly as a requirement of advice and consent in the Treaty Clause. U.S.

8

"Recess", no doubt, is a malleable term because of the several types of breaks that the Senate takes. As far as a recess is considered a break of the Senate, all recesses can be classified generally as adjournments, in the sense that they are suspensions in the business of the Senate until a further date. Adjournments, though, come in different species. An adjournment sine die usually signifies the end of a regular session of Congress. *See* Henry B. Hogue, Cong. Research Serv., *Recess Appointments: Frequently Asked Questions* 1-2 (Jan. 9, 2012). An adjournment to a day and time certain will conclude the business of one legislative day until the next. Floyd M. Riddick & Alan S. Furman, *Riddick's Senate Procedure: Precedents and Practice*, S. Doc. No. 101-28, at 14 (1992) (hereinafter "Riddick's Senate Procedure"). The Senate will also adjourn for lunch by recessing. *See, e.g.*, 159 Cong. Rec. S1249 (daily ed. Mar. 7, 2013) ("Under the previous order, the Senate stands in recess until 2 p.m. Thereupon, the Senate, at 12:30 p.m., recessed until 2 p.m. and reassembled when called to order by the Presiding Officer . . . .").

It is telling that the Framers chose to use the term "Adjournment" several times elsewhere in the Constitution. Accordingly, there must be some reason why the Framers did not use "Adjournment" in the Recess Appointments Clause and did not use "Recess" where "Adjournment" appears. The apparent and plain explanation for this distinction in terminology is that, elsewhere in the Constitution,

Const. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators *present* concur . . . ." (emphasis added)).

9

"Adjournment" refers to a certain species of breaks of Congress different from the species of breaks referred to by the "Recess" in the Recess Appointments Clause. *See Noel Canning*, 705 F.3d at 500 (determining that "the Framers intended something specific by the term 'the Recess,' and that it was something different than a generic break in proceedings").

To illustrate, the scenarios embodied by the clauses that employ "Adjournment" could apply to adjournments between two daily sessions of Congress — perhaps the adjournment that occurs during the weekends of a regular session of Congress — whereas "Recess" would not apply to such an adjournment if the Senate was still available to provide advice and consent. The Majority observes that the Supreme Court held that "Adjournment", as used in the Pocket Veto Clause, could refer to any break in business. (Majority Op. at 45.) It is true that "Recess" encompasses a narrower subcategory of breaks than "Adjournment". (Majority Op. at 71 ("So the dichotomy does reveal that recess must mean something narrower than any break that follows an adjournment.").) But, unlike the Majority, I do not understand this distinction to be meaningless. (Majority Op. at 71 ("But what this narrower definition is cannot be derived from the dichotomy between adjournment and recess alone.").)

As a narrower species of breaks than "Adjournment", "Recess" cannot reasonably be read to include every type of adjournment, such as the breaks the Senate takes for lunch, for the night between daily sessions, and over the weekends. *See* 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 409-10

10

(Jonathan Elliott ed., 2d ed. 1836) (hereinafter "Elliott's Debates") (statement of James Madison at the Virginia convention) ("There will not be occasion for the continual residence of the senators at the seat of government. . . . It is observed that the President, when vacancies happen during the recess of the Senate, may fill them till it meets.").

In the case of the Adjournments Clause, the adjournment contemplated there is also different than "the Recess" contemplated by the Recess Appointments Clause. To encompass "the Recess" within the adjournment contemplated by the Adjournments Clause would submit the President's recess appointment power to the whims of the House because the House must provide its consent if the Senate is to adjourn for more than three days. This is a result clearly antithetical to the text of the Constitution and the intent of the Framers. As Hamilton admonished, the House was not to interfere with the appointments process because "[a] body so fluctuating and at the same time so numerous can never be deemed proper for the exercise of that power [of appointments]. Its unfitness will appear manifest to all when it is recollected that in half a century it may consist of three or four hundred persons." The Federalist No. 77, at 463 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Our analysis must also be educated by the provident lesson of the Supreme Court in *The Pocket Veto Case*, 279 U.S. 655 (1929), since the mechanism and construction of the Pocket Veto Clause closely parallels the Recess Appointments Clause in striking ways.[8] The Majority relies

---

[8] *The Pocket Veto Case* and *Wright*, like other cases on other aspects of the executive power, are not wholly applicable to

11

on *The Pocket Veto Case* in its analysis but misses the true import of that case's analysis. (Majority Op. at 45, 69.) Both the Pocket Veto Clause and the Recess Appointments Clause provide a check on Congress when it is unavailable to perform one of its functions by placing a procedural limit on the exercise of its power. In that case, the Court considered whether the "ten Days" language of the Pocket Veto Clause included all days or just "legislative" days. The Court refused to read the modifier "legislative" into the Pocket Veto Clause, favoring a more expansive reading of the Clause. *Id.* at 679-80. The Court then faced a dichotomy similar to our intersession-intrasession divide: Whether the use of "Adjournment" in the Pocket Veto Clause only applied to *final* adjournments or also to *interim* adjournments. *Id.* at 680-81. The Court again rejected a constricted reading of the Clause and favored a broader executive power, holding that "adjournment" could apply to either type of adjournment because "[t]he power thus conferred upon the President cannot be narrowed or cut down by Congress, nor the time within which it is to be exercised lessened, directly or indirectly." *Id.* at 677-78.

While the Majority focuses on why "the Recess" only refers to intersession recesses, there is a bald deficiency in these arguments. The Majority's intersession limitation reads modifiers into the Recess Appointments Clause that are plainly not part of the text.[9] These modifiers rewrite the

our decision but both certainly provide insight and counsel about how we should resolve what is an analogous issue.

[9] The Majority attempts to show that I, too, am reading a modifier into the Recess Appointments Clause by turning "the Recess" into "the Recess in which the Senate cannot

12

Constitution for the Framers. The imperative set in *The Pocket Veto Case*, where parties attempted to read similar modifiers into the Constitution, chides against limiting the recess appointment power by inserting a modifier like "intersession" before "Recess" and supports including multiple types of recesses within the meaning of "the Recess". *See* 279 U.S. at 679 ("There is nothing whatever to justify changing this meaning by inserting the word 'legislative' as a qualifying adjective."); *id.* at 680 ("The word 'adjournment' is not qualified by the word 'final'; and there is nothing in the context which warrants the insertion of such a limitation.").

The Recess Appointments Clause does not distinguish between intersession and intrasession recesses. *See Evans*, 387 F.3d at 1224-25. Accordingly, we should not read such a limitation onto the executive power where one has not been directly conferred by the Framers. *Cf. Myers v. United States*, 272 U.S. 52, 118 (1926) (reasoning that the executive power

provide Advice and Consent". But there is a distinction between our approaches. If my definition can be considered a modifier, it only reflects how the Appointments Clause modifies the Recess Appointments Clause. While I limit the operation of the Recess Appointments Clause, as a whole, with another clause (the Appointments Clause), the Majority limits the word "Recess" with another word (the modifier). As opposed to the modifier that the Majority reads into the Constitution, the Appointments Clause already exists in the Constitution and is meant to modify the Recess Appointments Clause. Under my definition, any type of recess — be it intersession or intrasession — is considered "the Recess", so I do not read a new modifier onto "the Recess" itself.

is "limited by direct expressions where limitation was needed, and the fact that no express limit was placed on the power of removal by the executive was convincing indication that none was intended"). The Recess Appointments Clause sets forth no exceptions defining the type of recesses that may be excluded, whereas the Framers provided exceptions elsewhere in the Constitution. The only modifier of "Recess" is "the" and "the" certainly is not synonymous with "intersession". *Evans*, 387 F.3d at 1224. Nor is "the" readily interpreted as "a single type of", which would need to be the reading if "Recess" is only to refer singularly to intersession recesses. Even the Majority, unlike *Noel Canning*, concedes that "the" lacks the necessary specification to limit "Recess" to one type of recess.[10] (Majority Op. at 57 (observing that "there is nothing in the word 'the' itself that necessarily requires . . . intersession breaks").)

---

[10] The Majority also attempts to extract a sense of "permanence" and "longevity" from dictionary definitions of "recess" at the time of ratification, but such vague terms lack any real substance. (Majority Op. at 40-41.) Even if the Majority's qualifications, "permanence" and "longevity", were persuasive, they would support recess appointments during long intrasession recesses and prohibit recess appointments during short intersession recesses. The longevity and permanence of a thirty-day intrasession recess is no less than that of a thirty-day intersession recess. Moreover, as the Majority admits about a similarly vague descriptor, "there is no constitutional basis for defining 'long' and the definition is unsupported by the other relevant constitutional provisions." (Majority Op. at 86.)

14

Framed differently, if the text of the Recess Appointments Clause was meant to distinguish between intersession and intrasession recesses, the Framers would have employed some other modifier not as cryptic or pedestrian as "the". If that had been their intent, the Framers were certainly deliberate enough to have inserted some modifier to indicate that "the Recess" only refers to the recess between regular sessions of Congress. *See Wright*, 302 U.S. at 588 (establishing that, as an essential tenet of constitutional interpretation, courts must respect "'the high talent, the caution, and the foresight of the illustrious men who framed [the Constitution]'" such that "'[e]very word appears to have been weighed with the utmost deliberation'" (quoting *Holmes v. Jennison*, 39 U.S 540, 571 (1840))); *United States v. Sprague*, 282 U.S. 716, 732 (1931) (describing the Constitution as an "instrument drawn with such meticulous care and by men who so well understood how to make language fit their thought").

Consequently, it is telling that, despite that possibility, they chose not to include such a modifier and chose one of the most bland modifiers in the English language. Also, congruent with the Framers' use of "Adjournment" to refer to a broader category of breaks than "Recess", it is plausible that "the" as a modifier serves to emphasize that "Recess" refers to a definite, circumscribed class of adjournments. As Hamilton assured, there is an "obvious meaning of the terms" in the Recess Appointments Clause. The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

This same point about reading modifiers into the Constitution applies with equal vigor to arguments that the length of "the Recess" should be limited to a certain number of days. In relation to the durational limits of intrasession and

15

intersession recesses, the use of express day limits elsewhere in the Constitution suggests that the Framers deliberately chose not to include such a modifier in the Recess Appointments Clause. In the Pocket Veto Clause, the Framers deliberately added a day limitation (rather than simply saying that a bill would not become law if it could not be returned to the house in which it originated). This shows that the Framers could have crafted a similar day limitation into the Recess Appointments Clause if they had so desired. In addition, there are no time constraints on the Appointments Clause itself. As the Majority points out, the Appointments Clause "lacks any limitation on when this power is operative" such that "the president *always* has the power to fill vacancies through nomination and the advice and consent of the Senate." (Majority Op. at 58 (emphasis in original).) But, since the Recess Appointments Clause depends on when the Appointments Clause is not operative and similarly lacks any explicit limitation, there is no consistency in reading a hard time limit into the Recess Appointments Clause without reading one into the Appointments Clause.

The other flaw in the Majority's premise that "Recess" is restricted to intersession recesses is that it relies on a technical definition of "recess" rather than a plain and ordinary definition of "recess". *See The Pocket Veto Case*, 279 U.S. at 679 ("The words used in the Constitution are to be taken in their natural and obvious sense . . . ."); *see also District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) ("Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."). As a document written for the people and meant to be accessible to every citizen, we must assume

16

that the Framers intended for words to be understood by their ordinary, rather than their technical, definition.  *See Heller*, 554 U.S. at 576-77.   The Majority admits that "Recess" "lacks a natural meaning that clearly identifies whether it includes only intersession breaks or also includes intrasession breaks." (Majority Op. at 40.)  The logical inference from the Majority's assessment is that "Recess" lacks a natural limitation or natural specification.   Thus, the only way to delimit "Recess" to intersession recesses would be to shroud it in an *unnatural* meaning, which would not lend an obvious or ordinary meaning to the word.[11]

The narrowing of the term "Recess" by the Majority belies the broad latitude of the plain meaning of the word used by the Framers.  The Framers did not modify the term by

---

[11] The Majority's definition is even more technical since it intertwines the practices of a hodgepodge of state constitutions and state governors' practices.   It is highly unlikely that early citizens would have made such a strained correlation; in other words, it would not have been "obvious" to an average citizen to look to state constitutions, let alone to know which two of the twelve constitutions of the ratifying states to analyze.   *See Heller*, 554 U.S. at 576 ("In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931))).   It may be reasonable to expect the average citizen to have knowledge of the words in a dictionary, but it is a very different expectation to assume that they would be able to reference state constitutions.

17

describing it as "the intersession Recess" or "the Recess between Sessions" — they deliberately used a less qualified and, duly, broader term. To interpret the text otherwise also seems less plausible since it is far-fetched to suppose that the Framers expected for the Recess Appointments Clause to be interpreted through the textual hopscotch needed to arrive at the intersession interpretation. Such a patchy guesswork does not conjure the "obvious meaning" described by Hamilton.[12] The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

The Majority attempts to thread together several divergent lines of reasoning for why "the Recess" should be limited to intersession recesses, but each of these lines frays too easily. To begin with, there is no evidence that the Framers based the terms used in the Constitution on Jefferson's *A Manual of Parliamentary Practice* and the Majority readily admits that the correlation between the

---

[12] In addition, the Framers used the singular "Recess" rather than the plural "Recesses" but this distinction reveals little. Given the multiple intersession recesses, and multiple intrasession recesses, during and between the regular sessions of Congress, the singular "Recess" cannot refer literally to a single recess of the Senate (for instance, the single Recess that happens between the last regular session of one Congress and the first regular session of the following Congress). The only other use of "Recess" in the Constitution, which appears in Article I, Section 3, Clause 2, also does not literally refer to a single type of recess. Used in the context of "the Recess of the Legislature of any State", the Article I "Recess" does not refer to a particular recess since it was used to generically refer collectively to the recesses of every state's legislature.

18

Constitution's terminology and Jefferson's treatise is rather tenuous. (Majority Op. at 45.) Further, while it may be reasonable to assume that the Framers were aware of the parliamentary procedures described by Jefferson in *A Manual of Parliamentary Practice*, it is less reasonable to assume that the Framers intentionally based their use of "recess" and "adjournment" in the Constitution on particular terms used in Jefferson's treatise without any reference.[13]

The Majority's discussion of early state constitutions is similarly off the mark. Noticeably absent from the Majority's analysis of state constitutions is any reference to the constitution of North Carolina, which is generally accepted as a model used by the Framers in drafting the Recess Appointments Clause. *See Noel Canning*, 705 F.3d at 501; Office of Legal Counsel, *Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions*, 36 Op. O.L.C. 1, 10 n.14 (2012) ("The [Recess Appointments] Clause, which was proposed by a North Carolina delegate, is generally considered to have been based on a similar provision then in the North Carolina Constitution."). Further, despite the Majority's reliance, it is unclear that the Massachusetts and New Hampshire constitutions have any connection to "the Recess" except for

---

[13] The Majority attempts to draw significance from the "of the Senate" language but this phrase could not be plainer. (Majority Op. at 42.) It means exactly what is says and there is no indication, whatsoever, that the Framers used that phrase to indicate that they were relying on the "recess" as it might be defined in Jefferson's *A Manual of Parliamentary Practice*.

19

the fact that representatives from those states ratified the Constitution.

Finally, based on its analysis of a smattering of early state practices and state constitutions, the Majority concludes that "Recess" must refer to a break of a "considerable period of time" and must be marked by when the Senate adjourns. This point fares no better. One flaw in these two characteristics is that a "considerable period of time" lacks a limiting principle since "considerable" is a relative term. (Unsurprisingly, the Majority finds such a lack of a limiting principle problematic for intrasession recesses.) While I agree that "Recess" does not refer to the day-to-day recesses between daily sessions of the Senate (or its breaks for lunch and the weekend), the Majority's method of interpretation is dubious. From a mere three instances of intrasession breaks by three state governors over 200 years ago, the Majority extrapolates this characteristic. (Majority Op. at 54.) But three actions by different state governors is thin ice upon which to interpret our Constitution.

## B. The Intent of the Framers and the Purpose of the Recess Appointments Clause

While the proper starting point, textual interpretation of the Recess Appointments Clause is nettlesome because the Constitution was not written with a definition of terms section. With such difficulty in its textual interpretation, other sources, namely the intent of the Framers, the purpose of the Constitution and its Recess Appointments Clause, and the tradition and practice of the President and the Senate, are

20

pivotal in arriving at an intelligent and sensible definition of "the Recess".

## 1. The Framers' Intent

The Framers' purpose in creating the separation of powers was to devise a system of equal give and take, so that the President and the Senate, while not beholden to each other, would be forced to work with each other and reach compromise.[14]  By protecting the governmental architecture that the Framers inscribed in the Constitution, the inclusion of intrasession recesses in "the Recess" is most faithful to the intent of the Framers.  The Majority's definition of "the Recess" essentially tips that balance in favor of the Senate and, therefore, upsets the applecart of the balance of powers. The Majority states that the "most significant weakness" of

---

[14] To discern the Framers' intent, one reliable source is The Federalist Papers.  *See Dames & Moore v. Regan*, 453 U.S. 654, 659 (1981); *Buckley v. Valeo*, 424 U.S. 1, 129 (1976); *see e.g.*, *Heller*, 554 U.S. at 595, 598; *United States v. Lopez*, 514 U.S. 549, 552, 576-77 (1995); *INS v. Chadha*, 462 U.S. 919, 947, 950, 955 n.21 (1983).  The Federalist Papers that directly comment on the Recess Appointments Clause and the Appointments Clause are useful sources of edification, but also helpful are those Federalist papers that articulate the philosophy and principles guiding the operation of the Constitution as a whole, particularly those concerning the separation of powers and the system of checks and balances. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring).

21

the intrasession recess definition is that it lacks a discrete day limit. But nothing in the Constitution or the intent of the Framers suggests that such a finite day limit is necessary to the definition of the Recess Appointments Clause. The fragile balance of power underlying the recess appointments process is inconsistent with specific time strictures and neither the Constitution nor the Framers contemplated such exactitude.

In The Federalist No. 67, Hamilton established that the President's recess appointment power is "nothing more than a supplement" and an "auxiliary method of appointment" to be used when "the general method [of seeking the Senate's advice and consent] was inadequate." The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Beyond these few sentiments, the Recess Appointments Clause cannot be fully understood in isolation but only within the fabric and spirit of the Constitution as a whole. Other Federalist papers, which describe the separation of our government's powers, instruct that the power of appointment must be coordinated so that no branch can "possess, directly or indirectly, an overruling influence over the others." The Federalist No. 48, at 308 (James Madison) (Clinton Rossiter ed., 1961). The wisdom of this structuring is borne out in the appointments process because the recess appointment power and the advice and consent power, as any well-defined check, are not absolute, but cabined, in their design.

While it cannot function as an absolute negative, the recess appointment power must provide some balance to the Senate's power to provide or withhold advice and consent. The Federalist No. 73, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("From these clear and indubitable principles [of legislative overreach] results the propriety of a

negative, either absolute or qualified, in the executive upon the acts of the legislative branches."). Both James Madison and Hamilton recognized the zealousness of the legislature and the importance of establishing checks to counteract its overruling influence. The Federalist No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961) (explaining that, while the executive predominates in a monarchy, "[i]n republican government, the legislative authority necessarily predominates"). Without such a counterbalance, the Senate's advice and consent power could degenerate into an absolute negative that would undermine the President's recess appointment power, along with the entire appointments process.[15] *See* The Federalist No. 48, at 309-10 (James Madison), No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961).

Consequently, to protect this separation and balance of powers, the President must be formidable enough to countermand Congress and prevent the Senate from eviscerating his appointments prerogative through its use of advice and consent. *See Myers*, 272 U.S. at 116-17 ("The debates in the Constitutional Convention indicated an intention to create a strong executive . . . ."). It is critical that the President be afforded greater checks to guard against the

---

[15] In this respect, the advice and consent power of the Senate mimics the veto power of the President since they are both qualified negatives on the other branch's inherent power. *See Myers*, 272 U.S. at 120 (calling the advice and consent power "the Senate's veto on the President's power of appointment"). Just as the veto power cannot exist without a check, the advice and consent power of the Senate cannot exist without a check.

23

coercion of Congress since the executive is the inherently weaker branch of government. The Federalist No. 51, at 322-23 (James Madison) (Clinton Rossiter ed., 1961) ("As the weight of the legislative authority requires that it should be thus divided, the weakness of the executive may require, on the other hand, that it should be fortified.").

In many ways, the check of the Recess Appointments Clause also resembles the Pocket Veto Clause in Article I, Section 7. Interestingly, Justice Joseph Story remarked that without the pocket veto "[C]ongress might . . . defeat the due exercise of [the President's] qualified negative by a termination of the session, which would render it impossible for the President to return the bill." 2 Joseph Story, *Commentaries on the Constitution* § 888, at 354-55 (1833). Likewise, without intrasession recess appointments, the Majority's position makes it impossible for the President to exert his necessary influence in the appointment of his executive officers since the Senate could too easily wrest that power from him through procedural machinations.[16]

---

[16] Like the veto power, the recess appointment power is a check that the President exerts against the Senate, such that both are shaped by the same principles of governmental design. Further, the Framers' motivation for creating the President's veto power underlies the other checks it has given the President. Primarily, that motivation was the "propensity of the legislative department to intrude upon the rights, and to absorb the powers, of the other departments [which] has been already more than once suggested." The Federalist No. 73, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Hamilton also believed that giving the President such strong checks on Congress would not lead him to abuse his power.

With these considerations in mind, courts must proceed carefully in construing the executive power narrowly. The stakes are too high and the consequences too dire if the executive power is unduly constricted. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 670 (1892) (assessing the severe consequences of the judiciary interceding in the actions of the other branches of government); *Baker v. Carr*, 369 U.S. 186, 211 (1962); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 640 (1952) (Jackson, J., concurring) ("However, because the President does not enjoy unmentioned powers does not mean that the mentioned ones should be narrowed by a niggardly construction.").

Ultimately, the executive power must be strong enough to allow the President to "take Care that the Laws be faithfully executed" and "Commission all the Officers of the United States." U.S. Const. art. II, § 3, cl. 1. The central role of the President in appointing the officers serving his branch of government was devised by the Framers with great

He surmised that, "[i]f a magistrate so powerful and so well fortified as a British monarch would have scruples about the exercise of the [veto power], how much greater caution may be reasonably expected in a President of the United States, clothed for the short period of four years with the executive authority of a government wholly and purely republican?" *Id.* at 444. "[A]s a rule," Hamilton wrote, "one man of discernment is better fitted to analyze and estimate the peculiar qualities adapted to particular offices, than a body of men of equal or perhaps even of superior discernment" since the legislature is more easily captured by private interests. The Federalist No. 76, at 455-56 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

purpose. *See Myers*, 272 U.S. at 117-19. By having a hand in choosing the officers serving in his branch, the President would be able to surround himself with the people he believed best fit to help him fulfill his duty to faithfully execute the laws under the Take Care Clause. *See id.* Not only does he need to have input in the officers chosen, but the President needs the power to keep offices occupied in order to keep his branch and the government, as a whole, running. Therefore, ensuring that the Senate does not unduly encroach upon the President's role in the appointments process is integral to ensuring that the President is able to faithfully execute his duties. *Id.* at 117-18 ("[The President's] selection of administrative officers is essential to the execution of the laws by him . . . .").

## 2. The Purpose of the Recess Appointments Clause

The purpose of the Recess Appointments Clause, which is much more ascertainable than the textual interpretation of "the Recess", offers further guidance in this construction of the Recess Appointments Clause and the meaning that should be ascribed to "the Recess". In The Federalist No. 67, Hamilton pinpointed the dual purposes of the Recess Appointments Clause, which are 1) to allow the Senate to take breaks and 2) to keep offices filled (since "it might be necessary for the public service to fill [vacancies] without delay").[17] The Federalist No. 67, at 410 (Alexander

---

[17] In addition, other contemporaneous writings reveal that the reason why the Senate was given the check of providing advice and consent on appointments was that representatives of the smaller states were worried that the larger states would

Hamilton) (Clinton Rossiter ed., 1961). To Madison, this meant that the Senate would be recessed for purposes of the Recess Appointments Clause when Senators were not in "continual residence" in the Capitol. 3 Elliott's Debates 409-10 (statement of James Madison at the Virginia convention).

Thus, as imagined by the Framers, the Recess Appointments Clause had a two-part purpose: to allow the Senate to break from its usual business and, in that absence, to allow vacant offices to be filled in order to keep the machinery of government running. *See Evans*, 387 F.3d at 1226 ("[W]hat we understand to be the main purpose of the Recess Appointments Clause—to enable the President to fill vacancies to assure the proper functioning of our government—supports reading both intrasession recesses and intersession recesses as within the correct scope of the Clause.").

The Majority claims that a "crucial" purpose of the Recess Appointments Clause is to preserve the Senate's advice and consent power by limiting the President's unilateral appointment power. (Majority Op. at 60-61.) This misses the intent of the Framers. It is indisputable that the Recess Appointments Clause gives the President additional power, so why would the Framers limit the President's power by giving him additional power? There is no dispute that there are limitations written into the Recess Appointments Clause, but all the separate powers of the appointments

_____

be favored in the appointments process. *See Myers*, 272 U.S. at 119-20. This purpose is not served any more or less by intrasession recess appointments than intersession recess appointments.

27

process have limitations despite being drafted to give a branch enhanced power. Further, nothing in the contemporaneous writings, especially The Federalist Papers, claims that this was a "crucial" purpose of the Recess Appointments Clause, let alone any other purpose.

In the words of Justice Story, the purpose of the Recess Appointments Clause was "convenience, promptitude of action, and general security." 3 Joseph Story, *Commentaries on the Constitution* § 1551, at 410 (1833). Moreover, consistent with the Framers' principles underlying the framework of our republic, the purpose of the Recess Appointments Clause was also to provide a check on the Senate's control over the appointment of officers by sharing the power of confirmation with the executive branch. Allowing the advice and consent of the Senate to act as an absolute negative on the President's nominations without a check would defeat the dual purposes of the Recess Appointments Clause and allow "advice and consent" to be aggrandized into the "mandate and order" of the Senate. *See Myers*, 272 U.S. at 118 (characterizing the Senate's advice and consent as a "limitation[] upon the general grant of the executive power, and as such, being [a] limitation[], should not be enlarged beyond the words used").

As a check, though, the Recess Appointments Clause is by no means absolute. Thus, although allowing the President to make intrasession recess appointments increases his clout in the appointments process, his power to make recess appointments has embedded limitations. First, the recess appointment power can only be used when the Senate is recessed. If the Senate wants to curb the President's use of recess appointments, it can simply remain available to provide advice and consent, thereby forcing the President to

rely on its advice and consent in making appointments.[18] Second, recess appointments have a temporary duration since they only last until "the End of [the Senate's] next Session." At most, this allows the term of a recess appointee to last the length of two regular sessions (under current Senate practices, this equates to a maximum of approximately two years). Third, as evidenced by the structure of Article II, Section 2, the recess appointment power can only be a secondary means of appointing officers and can never be used as a primary means of doing so as long as the Senate is available to provide advice and consent.

Nevertheless, the Majority concludes that intrasession recess appointments would allow the President to circumvent the Senate's role in the appointments process; however, protection against such circumvention is built into the Recess Appointments Clause. By these three limiting principles, alone, the President pays a steep price for using his recess appointment power. *See United States v. Woodley*, 751 F.2d 1008, 1014 (9th Cir. 1985) (en banc) (observing that a recess-appointed Article III judge "lacks life tenure and is not protected from salary diminution" such that the "[recess appointment] power is not unfettered . . . but is subject to its own limitations and safeguards"). Indeed, these strictures on the President's recess appointment power prevent him from usurping the Senate's power to provide advice and consent. Moreover, use of the recess appointment power during intrasession recesses does not undermine the reason why the

---

[18] Of course, reference to advice and consent in this context does not include pro forma sessions, which clearly do not provide an opportunity for the Senate to provide its advice and consent. This point will be elaborated further *infra*.

29

Framers granted the Senate the power of advice and consent, which was preventing larger states from having a disproportionate influence on appointments, any more than use of the recess appointment power during intersession recesses. *See Myers*, 272 U.S. at 119-20. With these strictures, the Majority's concern about the President making unannounced recess appointments "by waiting until [the Senators] go home for the evening" is not fathomable. (Majority Op. at 64.)

But these are not the only limiting principles cabining the President's recess appointment power. In addition to these express checks, there are implicit checks on the use of his recess appointment power that were recognized by the Framers. Firstly, as explained in The Federalist Papers, the structure of the branches of government, as conceived by the Constitution, give the President a very strong interest in maintaining the favor of the Senate and not stoking its ire. The Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("[A] new President would be restrained from attempting a change in favor of a person more agreeable to him by the apprehension that a discountenance of the Senate might frustrate the attempt, and bring some degree of discredit upon himself."). Secondly, the President is beholden to public opinion. *See* The Federalist No. 73, at 444 (Alexander Hamilton) (Clinton Rossiter ed., 1961); 3 Joseph Story, *Commentaries on the Constitution* § 1523, at 375 (1833) ("He will be compelled to consult public opinion in the most important appointments . . . . If he should act otherwise, and surrender the public patronage into the hands of profligate men, or low adventurers, it will be impossible for him long to retain public favour."); *Myers*, 272 U.S. at 123. Because of public opinion, the President is incentivized

to use his recess appointment power sparingly, lest the public perceive that he is trying to thwart the advice and consent of the Senators that they have elected to office, or lest the public lack faith in his appointees because they have not been vetted by the Senators that they have elected to office. Thirdly, as far as mechanics, the Senate can check the President's use of his recess appointment power during intrasession recesses by controlling when it recesses and how long it stays in regular sessions. As a result, it can control if the President is able to use his recess appointment power at all and how long his recess appointees will remain in office.

What the Majority overlooks is the following: The problem with limiting the Recess Appointments Clause to intersession recesses is that such an interpretation disarms the reciprocal checks that the President needs to have on the Senate. While the President pays a steep price for foregoing the advice and consent of the Senate, the Senate pays a relatively low price for thwarting the President's power to make recess appointments by, for example, reducing its intersession recesses to negligible periods of time (for instance, one day). Consequently, the safeguard against the encroachment of the Senate on the power of the President is much weaker. The great harm is that the Senate may engage in machinations, as some would argue is the case with pro forma sessions, to avoid voting on nominees in order to strong-arm the President into capitulating to its demands, forcing the President to nominate the Senate's preferred candidates or else leave offices vacant, as Hamilton expressly feared. It is inconceivable that the Framers intended such strong-arming by the Senate; of equal, and possibly greater, concern is the House's involvement in the strong-arming,

31

which surely was not intended by the Framers.[19]  *See* The Federalist No. 51, at 322 (James Madison), No. 73, at 442-43 (Alexander Hamilton), No. 76, at 455-56 (Alexander Hamilton), No. 77, at 463 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Therefore, the President must be able to exercise his recess appointment power whenever the Senate is not available to provide advice and consent, including when the Senate is holding pro forma sessions, when it is not readily available to be present to deliberate and vote on nominees. Just as it is incredulous to suggest that the President can make recess appointments during the Senate's lunch, it is equally incredulous for the Majority to suggest that advice and consent can be provided in thirty-second increments once every three days.  (In fact, it may be more incredulous since it presumably takes longer than thirty seconds for 100 Senators to act on a nomination.)  Further, conducting business via unanimous consent agreement, as the Senate did on

---

[19] The Majority suggests that the issue of the House exerting influence over recess appointments is remedied by the President's ability to adjourn both houses if they cannot agree on a date of adjournment.  U.S. Const. art. II, § 3.  This assertion misses the mark.  This power of the President does not address the issue of the House essentially creating pro forma sessions to corrupt the intersession-intrasession dynamic.  The Majority's remedy is tantamount to saying that the President can initiate an adjournment sine die to create an intersession recess of more than three days whenever he wishes to utilize the Recess Appointments Clause.  This is not true.  Moreover, this clearly would not be a supplemental use of his recess appointment power.

December 23, 2011, is not the type of business that yields the advice and consent envisioned by the Framers.[20]

The Constitution does not contemplate that the Senate may have it both ways. The Senate cannot be both unavailable and yet force the President to submit to its advice and consent. This dynamic acts as a check on Senate coercion (and House coercion) because, in order to take recesses and breaks from its regular business, the Senate will either have to cooperate with the President and figure out mutually acceptable nominees or will have to yield its advice and consent power to the President's recess appointment power.

Along these lines, the Supreme Court has applied a functional approach in determining the scope of executive powers. It did so in determining when the Senate is available to receive a bill from the President for the purposes of the Pocket Veto Clause, concluding that having a secretary of the

---

[20] The Majority assumes that the Senate could have simply remained available to provide advice and consent by not agreeing to not conduct business during the pro forma sessions or "alter[ing] its procedures to allow messages to be received during such sessions." (Majority Op. at 99.) First, it is a stretch to suggest that the receipt of messages from the President equates to providing advice and consent. In that respect, the Senate could remain available to provide advice and consent even during intersession recesses by leaving an agent of the Senate to receive messages. Second, the Majority identifies the danger of its own definition of "Recess": The Senate's procedures are too easily manipulated.

33

Senate present was sufficient, even if the members of the Senate had already departed to their home states. *See The Pocket Veto Case*, 279 U.S. at 680 (holding that "the determinative question in reference to an 'adjournment' is not whether it is a final adjournment of Congress or an interim adjournment, such as an adjournment of the first session, but whether it is one that 'prevents' the President from returning the bill to the House in which it originated within the time allowed").

Of course, providing advice and consent on nominees likely requires more on the part of Congress than receiving a bill from the President — unlike with the Pocket Veto Clause, one person cannot generally provide advice and consent on behalf of all 100 Senators. If this functional approach is used to effect the purposes of the Recess Appointments Clause, then the President must be able to make recess appointments when the Senate cannot provide advice and consent, and it is certainly possible for the Senate to lack that capacity to provide advice and consent during intrasession recesses when its members are not present in the Senate chamber to vote.

Pro forma sessions, if accepted as valid, undeniably frustrate the purposes of the Recess Appointments Clause. The pro forma sessions, and Congress's other attempts to manipulate the appointments process, appear to be the type of legislative overreaching chronicled by the Framers. *See* The Federalist No. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961) ("The legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex."). From Madison's sentiments, it is also evident that the legislature was not the "more feeble" branch that would need a "more adequate defense" but, rather, the branch that would enfeeble the other branches and

34

require that they be more adequately defended against such machinations. *See id.*

Moreover, under a functional approach, pro forma sessions cannot prevent the Senate from recessing for the purposes of the Recess Appointments Clause. When a pro forma session is held for approximately thirty seconds by a single Senator, the Senate is not able to accomplish the function of deliberating about and voting on the President's nominees.[21]

Indeed, the Framers could have faced the same dilemma faced by the President in 2010 and 2012 since it was entirely possible for the Senate to take short intrasession recesses early in our republic. In such an event, how would the Framers have intended for the Recess Appointments Clause to operate? They did not condition the Recess Appointments Clause on how far away Senators were from the Capitol when they recessed, or how long it would take them to return to the Capitol — they simply and only conditioned the Recess Appointments Clause on whether the Senate was in a recess, breaking from its regular business, and unable to provide advice and consent. Or what if the

---

[21] For the exact lengths of the pro forma sessions, see 157 Cong. Rec. S8787 (daily ed. Dec. 20, 2011), 157 Cong. Rec. S8789-90 (daily ed. Dec. 23, 2011), 157 Cong. Rec. S8791 (daily ed. Dec. 27, 2011), 157 Cong. Rec. S8793 (daily ed. Dec. 30, 2011), 158 Cong. Rec. S1 (daily ed. Jan. 3, 2012), 158 Cong. Rec. S3 (daily ed. Jan. 6, 2012), 158 Cong. Rec. S5 (daily ed. Jan. 10, 2012), 158 Cong. Rec. S7 (daily ed. Jan. 13, 2012), 158 Cong. Rec. S9 (daily ed. Jan. 17, 2012), 158 Cong. Rec. S11 (daily ed. Jan. 20, 2012).

Senate remained in pro forma sessions while it broke for six to nine months, as was its routine at the time of ratification, hoping that this would prevent the President from making recess appointments?

In such scenarios, the Framers would have empowered the President to make recess appointments. An empty office is an empty office. It makes no sense that the Framers would have differentiated between intrasession and intersession recesses in effectuating the purpose of the Recess Appointments Clause. *See Evans*, 387 F.3d at 1226 ("The purpose of the Clause is no less satisfied during an intrasession recess than during a recess of potentially even shorter duration that comes as an intersession break."). The atrophy of agencies and other offices caused by the Senate's absence did not then, and does not now, depend on whether the Senate is unavailable due to an intersession recess or intrasession recess — all that matters is the length of time that the Senate is away from its usual business, unable to provide advice and consent, while vacancies persist.[22]

---

[22] The other purpose of the Recess Appointments Clause, allowing the Senate to recess without leaving offices vacant, is also diminished by the Majority's definition of "Recess". Under the Majority's limited reading, the Senate might feel obliged not to take intrasession recesses when nominations are pending, and not feel at liberty to break, as Hamilton and the Framers desired, lest it cause a vacancy to remain open for the duration of its recess. This would have been traumatic during the era of the Framers: Imagine Senators packed and ready for their long journeys to their home states, only to find out that a cabinet secretary has suddenly resigned office. Rather than leaving the office of a secretary vacant for six to

36

Accordingly, the lack of an exact limiting principle, such as a day limit, does not provide sufficient reason to exclude intrasession recesses from "the Recess". First of all, any limit would be arbitrary. The ten-day limit proposed by Attorney General Daugherty, who issued the 1921 opinion in support of intrasession recess appointments, was not based on any identifiable principle; such a hard limit could be tied to the Pocket Veto Clause but there is no proof of a relationship between it and the Recess Appointments Clause and the processes of each are different, as conceived by the Framers and in the Constitution. The only day limit that might not be arbitrary is the three-day limit based on the Adjournments Clause but, as discussed, there is no real connection between

nine months, the Senators might very well feel compelled to remain in the Capitol to provide advice and consent for the new appointment, a process which could take weeks or months. Surely, this is not what the Framers envisioned, nor intended. This would also put undue pressure on the Senate to rush in making its appointment decisions when the Framers clearly intended that officers be appointed with careful deliberation.

Even with a less extreme example, we can imagine the same imposition on the Senate. As mentioned, it is no secret that the advice and consent process is a lengthy and strenuous process. *See Noel Canning*, 705 F.3d at 508 (calling the advice and consent process "cumbersome"); *United States v. Allocco*, 305 F.2d 704, 710 (2d Cir. 1962) (noting that the appointments process is onerous because of the "difficult task of securing a competent replacement").

the Adjournments Clause and the Recess Appointments Clause.

An alternative explanation for such a three-day limit would be that a recess of two days, over a weekend, should not constitute a recess sufficient to take the Senate away from its business. *See* Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 419-20 (2005). This would also prevent the extreme situation of lunchtime appointments and overnight appointments between daily sessions, which no party, and no court, has suggested is reasonable.

Due to this lack of a limiting principle, the Majority blithely asserts that intrasession recesses would betray the purpose of the Recess Appointments Clause because it would allow the President to make recess appointments any time the Senate breaks from its usual business, such as when it recesses for lunch or adjourns at the end of a daily session. The Majority is mistaken because there is no evidence that the Framers intended for the Recess Appointments Clause to be used this way and there is no evidence that any President ever has. It is beyond contention that the President cannot use his recess appointment power during the Senate's lunch break, when it adjourns nightly between daily sessions, or when it adjourns for the weekend. *See Noel Canning*, 705 F.3d at 500 (determining that "the Framers intended something specific by the term 'the Recess,' and that it was something different than a generic break in proceedings"). All of these recesses are regular breaks of the Senate, which do not impede its normal business. It would be preposterous to suggest that the Framers intended for the Senate to be held hostage in its chamber in order to retain its power to provide advice and consent.

The Majority's concern about the "temporal reach" and duration of intrasession recesses also overlooks the reality that there is little difference between the temporality of intersession recesses and intrasession recesses in theory or in practice. If the concern is that intrasession recesses may be too short, then one must also recognize that intersession recesses can be just as short or shorter than intrasession recesses. Similarly, if the concern is that "the Recess" must last a "non-negligible" number of days, then one must recognize that either an intersession or intrasession recess can last a "negligible" number of days. Consequently, it is indisputable that intersession recess appointments are vulnerable to the same uncertainties and lack of limiting principles as intrasession recess appointments. This conclusion cannot be saved by the magic words — the Senate "adjourned sine die".

The need to exclude recess appointments during the Senate's adjournments for lunch, the night, and the weekend would explain why the Framers chose to use the limited term "Recess" rather than the all-encompassing term "Adjournment" in the Recess Appointments Clause. "Recess" allows the Senate some leeway to take brief adjournments without recessing in a way that permits the President to make appointments without its advice and consent. As the Majority itself contends, "the dichotomy [between the use of 'Adjournment' and 'Recess'] must be that adjournment results in more breaks than recess does." (Majority Op. at 71.)

Further, it would appear unconstitutional for the President to use his recess appointment power to make appointments during those routine breaks of the Senate. As detailed below, by sitting on his nominations and sabotaging

39

the Senate in such a way, the President would not be using the advice and consent of the Senate as his primary means of appointing officers, in contravention of the plain structure and clear intent of the Framers.

The Majority also suggests that the purpose would be betrayed by allowing intrasession recess appointments because they are subject to variable lengths: An intrasession recess appointment made at the beginning of a regular session would last two regular sessions, while an intrasession recess appointment made at the end of a session would only last one regular session. But nothing in the text of the Constitution, the intent of the Framers, or the purpose of the Recess Appointments Clause provides evidence that such variability is violative. Firstly, variable lengths are not inherently forbidden by the Constitution. The check on the Recess Appointments Clause, by the plain language of the text of the Constitution, is that recess appointments have a fixed end, not necessarily a fixed length. There is no language to intuit that the Framers had intended otherwise. Secondly, intersession recess appointments are also prone to variable lengths: An intersession recess appointment made at the beginning of a three-month recess will last three months longer than an appointment made at the end of that intersession recess. Of course, post-ratification, when intersession recesses routinely lasted six months or longer, the lengths of recess appointments could have been even more disparate.

The Majority claims that the "End of their next Session" language in the Constitution also excludes intrasession recesses from the definition of "the Recess" because that language allows the Senate only a "single chance" to weigh in on appointments. (Majority Op. at 75-81.) But nothing in the language of the Constitution or the

intent of the Framers limits the Senate to a "single chance" at providing advice and consent. Even in the passage quoted by the Majority, Justice Story only requires that the Senate have "*an opportunity*" to act, rather than a "single opportunity". (Majority Op. at 76.) What if an appointment is pending during one regular session and the President does not make any recess appointments during the ensuing intersession recess — is the Senate no longer able to provide advice and consent in the next regular session because it has already had a "single chance" to provide advice and consent?

In this manner, including both intersession and intrasession recesses within the scope of the recess appointment power best realizes the purpose of the Recess Appointments Clause, i.e., to keep offices filled and allow the Senate to break from its regular business.

## C. The Branches' Historical Tradition and Practice

The historical tradition and practice of the branches of government is also very persuasive evidence of the meaning of the Constitution and endorses the propriety of including intrasession recesses in "the Recess". *See Mistretta v. United States*, 488 U.S. 361, 401 (1989); *The Pocket Veto Case*, 279 U.S. at 688-89; *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 890 (1991) (faulting an interpretation of the Constitution that "would undermine longstanding practice"); *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them."). *But see INS v. Chadha*, 462 U.S. 919, 944-45 (1983)

41

(noting that the long-term practice of the one-house legislative veto could not save it from being held unconstitutional). Moreover, as I have, the Supreme Court found its more expansive reading of the Pocket Veto Clause corroborated by the "[l]ong settled and established practice" of the President, which it said is to be accorded "great weight in a proper interpretation of constitutional provisions of this character." *The Pocket Veto Case*, 279 U.S. at 689.

Further, in reviewing the tradition and practice of the President, presidential actions are entitled to a presumption of constitutionality.[23] The Majority rejects any such notion that presidential actions deserve special regard, but the Supreme Court has repeatedly embraced such a principle. *United States v. Nixon*, 418 U.S. 683, 703, 710 (1974) (recognizing that "courts have traditionally shown the utmost deference to Presidential responsibilities"); *Chadha*, 462 U.S. at 951 ("When any Branch acts, it is presumptively exercising the

---

[23] Moreover, the early dearth of intrasession recess appointments does not provide convincing proof of their unconstitutionality. The President does not lose his constitutional powers because he does not use them. *See Freytag*, 501 U.S. at 880 (affirming that the President cannot "waive" his executive powers which provide the structural protections of the Constitution); *New York v. United States*, 505 U.S. 144, 182 (1992) (determining that the branches of government cannot cede their constitutional powers even if they voluntarily consent to do so and have done so for a substantial period of time). Constitutional powers do not become unconstitutional simply because they go unused.

power the Constitution has delegated to it. When the Executive acts, it presumptively acts in an executive or administrative capacity as defined in Art. II." (citing *J.W. Hampton & Co. v. United States*, 276 U.S. 394, 406 (1928))); *see also Evans*, 387 F.3d at 1222 ("And when the President is acting under the color of express authority of the United States Constitution, we start with a presumption that his acts are constitutional. . . . Just to show that plausible interpretations of the pertinent constitutional clause exist other than that advanced by the President is not enough."); *United States v. Allocco*, 305 F.2d 704, 713-14 (2d Cir. 1962). Not only does the President take an oath of fealty to the Constitution, and not only is his most important constitutional duty to "take Care that the Laws be faithfully executed," but such a presumption is integral to the operation of the executive branch. *See Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring) (establishing that a practice "engaged in by Presidents who have also sworn to uphold the Constitution . . . may be treated as a gloss on 'executive Power'").

The Majority carves out its own exception, suggesting that, in particular, no such presumption applies in separation of powers cases, but this presumption should apply with the most force in such cases. In executing the duties of his office, the President must not be hindered because the constitutionality of his actions is held in doubt. *See Baker v. Carr*, 369 U.S. 186, 210-11 (1962) (emphasizing the importance of respecting the finality of the actions of the political branches); *Nixon v. United States*, 506 U.S. 224, 236 (1993) (same). For a host of self-evident reasons, the judiciary should avoid upending longstanding practices of the other branches unless they are plainly unconstitutional. *See*

43

*Noel Canning*, 705 F.3d at 515 (Griffith, J., concurring); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring) (acknowledging principles of judicial restraint regarding constitutional questions).

## 1. The Tradition and Practice of the President

The tradition and practice of the President, especially since 1947, unequivocally shows that intrasession recess appointments have been continuously accepted as a constitutional use of the executive power. Since 1947, Presidents have made nearly 400 intrasession recess appointments without significant rebuke or controversy. *See* Henry B. Hogue et al., Cong. Research Serv., *The* Noel Canning *Decision and Recess Appointments Made from 1981-2013*, at 4 (Feb. 4, 2013). As it stands, intrasession recess appointments have been made as often as intersession recess appointments. *Id.* In addition, intrasession recess appointments have been condoned by the executive branch since at least 1921, even if they did not come into more common use until the 1940s. Despite this historical precedent, the Majority concludes that each of these Presidents has misinterpreted the Constitution.

Recess appointments have been used by Presidents ever since the birth of our republic. President Washington, himself, made several recess appointments. *See* Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 385, 387 (2005). The recess practices of the Senate have evolved, though, which has caused recess appointment practices to evolve in response. Early in our republic, the Senate did not

44

take intrasession recesses and took much longer intersession recesses than it does currently. *See* Congressional Directory for the 112th Congress 522-38 (2011).[24] According to the Congressional Directory, only five intrasession recesses were taken before 1860 and, of those five, the two longest were thirteen days. *Id.* After 1860, there was a surge in intrasession recesses and, since the 37th Congress, there has been at least one intrasession recess in each Congress, with the exception of approximately five sessions of Congress (out of approximately 150 regular sessions of Congress). *Id.* Thus, intrasession recesses have been the norm since 1860. Currently, the Senate takes between five and ten intrasession recesses each Congress, meaning that intrasession recesses far outnumber intersession recesses. *See* Henry B. Hogue, Cong. Research Serv., *Recess Appointments: Frequently Asked Questions* 2 (Jan. 9, 2012).

Despite the relatively early appearance of intrasession recesses, intrasession recess appointments did not come into vogue until the 1940s.[25] As mentioned, Presidents have made

---

[24] The Congressional Directory only lists recesses of "three or more days, excluding Sundays," so it is possible that the Senate took brief intrasession recesses early on. Congressional Directory for the 112th Congress 538 n.2 (2011). If so, then the dearth of early intrasession recess appointments would serve to confirm that intrasession recess appointments should not include intrasession recesses of less than three days.

[25] There is only an unexplained lack of intrasession recess appointments for the eighty years between 1867 and 1947. One possible reason for the near-absence of intrasession recess appointments during that period may be that

45

nearly 400 intrasession recess appointments since then. *See* Henry B. Hogue et al., Cong. Research Serv., *The* Noel Canning *Decision and Recess Appointments Made from 1981-2013*, at 4 (Feb. 4, 2013). Prior to 1947, there were only three recorded intrasession recess appointments. *Noel Canning*, 705 F.3d at 502 (citing Michael A. Carrier, Note, *When Is the Senate in Recess for Purposes of the Recess Appointments Clause?*, 92 Mich. L. Rev. 2204, 2209-12, 2235 (1994)). The

intersession recesses were still rather lengthy, often spanning several months, which gave the President ample time to make recess appointments during intersession recesses, compared to the relatively short duration of early intrasession recesses. Another possible explanation is that the passage of the Twentieth Amendment in 1933 forever changed the practices of Congress, especially the timing and length of their sessions and recesses. Louis Fisher, Cong. Research Serv., *The Pocket Veto: Its Current Status* 2-3 (Mar. 30, 2001). Before that amendment, there was usually a long first session (often over 200 days) and a shorter second session (lasting between 80 and 90 days). *Id.* at 2. As a result, prior to 1934, "a new Congress typically would not convene for regular business until 13 months after being elected" but, since passage of the amendment, "the time from the election to the beginning of Congress's term as well as when it convened was reduced to two months." Congressional Directory for the 112th Congress 522 (2011). In addition, as the Congressional Directory notes, prior to the Twentieth Amendment, "special sessions of the Senate were convened, principally for confirming Cabinet and other executive nominations," which could have made intrasession recess appointments less important. *Id.*

first is believed to have been made by President Andrew Johnson in 1867, which coincides with the surge in intrasession recesses that began in the 1860s. *See Noel Canning*, 705 F.3d at 501. As such, there is no reasonable inference that can be drawn about intrasession recesses except that the practices of the Senate prior to the Twentieth Amendment made the timing of recesses less of an issue than is the case now.

In the modern day, intrasession recesses are not only more frequent but also longer than they had been in the past. In fact, they are sometimes longer than some intersession recesses, which can be as short as a day.[26] With the large number of intrasession recesses taken, the net duration of intrasession recesses during a session of the Senate will often dwarf the net duration of intersession recesses, which means that the Senate is on break more often during sessions than between sessions.

As reflected earlier, given that recess appointments have been made for over 220 years and that no intrasession (or intersession) recess appointment has been made during a

_____

[26] A close inspection of the Congressional Directory reveals that there have been approximately thirteen one-day intersession recesses — while not frequent, they are not unprecedented and are certainly not an abstract or hypothetical possibility. *See* Congressional Directory for the 112th Congress 522 (2011). (This number excludes one-day intersession recesses between a regular session of Congress and a special session of Congress.) The last two one-day intersession recesses occurred on January 3, 2012, during the series of pro forma sessions, and January 3, 2013.

recess of less than ten days in at least the last thirty years, critics are wanting to allege that the President would abuse his executive power and make a recess appointment while the Senate broke for lunch or the end of the day. In the history of our republic, there has been no inkling that any President has engaged in that practice and, so, there is no reason to think that will happen now. *See Allocco*, 305 F.2d at 714 ("We have not been directed to a single instance of behavior by any President which might be termed an 'abuse' of the recess power.").

## 2. The Tradition and Practice of the Senate

The tradition and practice of the Senate also affirms that "the Recess" includes both intrasession and intersession recesses. In 1903, President Roosevelt made 160 recess appointments during what is literally described as a momentary intersession recess between the 1st and 2nd sessions of the 58th Congress. T.J. Halstead, Cong. Research Serv., *Recess Appointments: A Legal Overview* 10 (July 26, 2005). In response to these recess appointments by President Roosevelt, the Senate Judiciary Committee engaged in a project to opine on whether such a "constructive recess" of the Senate constituted "the Recess" of the Recess Appointments Clause. The committee concluded that it did not. Most telling was the 1905 report, which presented the Senate's view of the meaning of "recess", as used in the Recess Appointments Clause. The 1905 Report determined that "[t]he word 'recess' is one of *ordinary, not technical, signification*" and is used in the Recess Appointments Clause "in its *common and popular sense*." S. Rep. No. 58-4389, at 1 (1905) (emphasis added).

48

This report, if nothing else, endorses a broader, rather than a narrower, reading of the term "Recess" in the Recess Appointments Clause. Specifically, the 1905 Report explained that "recess" was "evidently intended by the [F]ramers of the Constitution that it should mean *something real, not something imaginary; something actual, not something fictitious.*" *Id.* at 2 (emphasis added). Very pragmatically, the 1905 Report set forth four criteria for qualifying a "recess": 1) the Senate is "*not sitting in regular or extraordinary session as a branch of the Congress, or in extraordinary session for the discharge of executive functions,*" such that 2) "its members owe no duty of attendance," 3) "its Chamber is empty," and 4) "it can not receive communications from the President or participate as a body in making appointments" "because of its absence." *Id.* (emphasis in original).

In addition to the intent of the Framers and the tradition and practice of the President, this definition from the 1905 Report forecloses the possibility of the President making recess appointments when the Senate breaks for lunch, for the night, and for the weekend. During those breaks, the Senate's capacity to participate as a body in the appointments process is not hampered any more than usual. In the same way that one of these brief, routine breaks does not make the Senate unavailable to provide advice and consent, a brief session does not make the Senate available to provide advice and consent, which is why the Senate cannot possibly provide advice and consent during pro forma sessions.

The 1905 Report also postulated that the Framers intended for the Recess Appointments Clause to serve dual purposes that could not be served if those criteria were met: to

prevent "grave inconvenience and harm to the public interest" and to ensure that "*at all times* there should be, whether the Senate was in session or not, an officer for every office, entitled to discharge the duties thereof." *Id.* at 2 (emphasis added). This accords with the purposes established by Hamilton in The Federalist No. 67.

The Senate has not officially changed positions since the issuance of this report. *See Nippon Steel Corp. v. Int'l Trade Comm'n*, 239 F. Supp. 2d 1367, 1374 n.13 (Ct. Int'l Trade 2002) (citing Michael A. Carrier, Note, *When Is the Senate in Recess for Purposes of the Recess Appointments Clause?*, 92 Mich. L. Rev. 2204 (1994)).

Additionally, in an act of legislative acquiescence, Congress has passed legislation that observes the possibility of intrasession recess appointments.[27] By its own choice, Congress passed, and has not since repealed, the Pay Act, a statute that allows recess appointees to be paid and does not differentiate between intersession and intrasession recess appointees. 5 U.S.C. § 5503; *see Evans*, 387 F.3d at 1226; *Woodley*, 751 F.2d at 1013.

---

[27] The Senate Manual also adopts a broader understanding of "the Recess" that is conditioned only on the length of a recess, rather than whether it occurs intrasession or intersession. According to the Senate Manual, motions to reconsider confirmation votes on nominees become moot after a thirty-day break, be it an adjournment or recess. *Senate Manual*, S. Doc. No. 112-1, at 58 (2012) ("Standing Rules of the Senate").

**II. THE VALIDITY OF THE MARCH 27, 2010 AND JANUARY 4, 2012 RECESS APPOINTMENTS**

Based on the foregoing analysis, in my judgment, the recess appointments of Member Becker on March 27, 2010 and Members Block, Flynn, and Griffin on January 4, 2012 are valid. Both sets of appointments were made during intrasession recesses when the Senate was not available to provide advice and consent. The President appropriately exercised his discretion, relying on the supplemental power of the Recess Appointments Clause to keep those offices filled for the sanctity of the public. The exclusion of intrasession recesses from the definition of "the Recess" denies him the ability to fulfill his constitutional duty and leads to a number of absurd results.

The Majority claims that the Senate was available to provide advice and consent during the pro forma sessions because it could have acted on the Members' nominations "if it had desired to do so." (Majority Op. at 66.) But this is an assumption with dangerous logical extensions. Under the Majority's logic, the Senate would always be available to provide advice and consent and the President would never be able to make recess appointments. Even during intersession recesses, the Senate could plausibly provide advice and consent "if it [] desired to" by simply cutting its intersession recess short. It is not as if the Senate is paralyzed while in an intersession recess.

To demonstrate another absurd result, Riddick's Senate Procedure documents that there is such a thing as a conditional sine die adjournment, which could allow the Senate Majority leader to call the Senate back into session on 24 hours' notice to resume the previous session — would

51

such a conditional sine die adjournment to start an intersession recess prevent the Senate from fulfilling its desire to provide advice and consent? *See* Riddick's Senate Procedure 18; Henry B. Hogue, Cong. Research Serv., *Recess Appointments: Frequently Asked Questions* 1-2 (Jan. 9, 2012) ("These adjournment resolutions today usually authorize leaders of each chamber to call it back into session after the sine die adjournment. If this power is exercised, *the previous session resumes* and continues until the actual sine die adjournment is determined, usually pursuant to another concurrent resolution of adjournment." (emphasis added)).

Under the Majority's interpretation of "the Recess" as an intersession recess, the Recess Appointments Clause is essentially neutered and the President's ability to make recess appointments would be eviscerated. A Senate opposed to the President's nominees would simply limit its intersession recesses to a day, or less, and use its power to provide advice and consent as an absolute negative to the President's power of appointment. It could then simply convert what would have been its intersession recess, when Senators would depart to their home states and not conduct business, into an intrasession recess. Thus, by this simple procedural change in title, the Senate would strip the President of this essential counterbalance in the exercise of his executive power and upset the balance of power. In a worst-case scenario, some offices could remain vacant for an entire administration, which could be as long as eight years. In addition, the Senate would have a disproportionate amount of influence on the President's nominees, since he would likely have to accede to the demands of the Senate's absolute negative.

If anything, the Majority's test — that an adjournment sine die marks an intersession recess — is unworkable and

52

not judicially manageable. Under the Majority's rationale, the President could make a recess appointment during any intersession recess, even if it only lasted a nanosecond, yet could not make a recess appointment during a six-month intrasession recess. This defies common sense and common logic. The Majority itself recognizes that intersession recesses suffer from the same lack of an exact durational limit as intrasession recesses, which undercuts its suggestion that intersession recesses are somehow immune to its criticism of intrasession recesses. (Majority Op. at 100 ("[T]he lack of a constitutional basis for selecting a long duration in defining intrasession breaks is just as absent to define intersession breaks.").)

The Majority further undercuts its distinction between intersession and intrasession recesses by stating, without reservation, that "the potential for abuse and subsequent gridlock lies not in what recess means but in the Constitution's framework of divided powers." (Majority Op. at 100.) This admits that the problem, and solution, lies not in the technical, procedural classification of the Senate's adjournment, but in whether the separation of powers is maintained. Thus, tying the definition of "Recess" to the availability of the Senate to provide advice and consent achieves the proper focus. It does so by basing the definition on the presence of the Senate's mechanism for maintaining the separation of powers in the appointments process — advice and consent — rather than the procedural classification of the recess.

Worse, by basing the recess appointment power on the Senate's procedure, the Majority has committed the Recess Appointments Clause to the Senate's discretion and procedural manipulations. The impracticability of the

53

Majority's standard is shown by the fact that the January 4, 2012 appointments issue could have simply been avoided if the appointments had been made a day earlier, on January 3, during the intersession recess.[28]  Not only that, but the Majority's standard would also allow the President to make an unlimited number of recess appointments during the type of "fictional" intersession recess exploited by President Roosevelt in 1903.  With such absurd results, the Majority's standard is an artifice that would clearly upset the separation of powers integral to a sound appointments process.

Under my standard, the entire period during which the Senate held pro forma sessions, from December 17, 2011 until January 23, 2012, would be treated the same.  Thus, the Senate would have been no more able to provide advice and

---

[28] The Majority attempts to displace the absurdity of its holding by showing that my standard also yields absurd results, but the Majority misses my point.  My point is only to show that it is absurd to suggest that a one-day intersession recess is somehow different than a long intrasession recess.  Thus, the Majority's holding that the President could have made a recess appointment on January 3, but not on January 4 or January 22, means that the one-day intersession recess on January 3 was somehow intrinsically different than January 4 or January 22.  I contend that January 3 is only different because it *technically* has a different *definition* than January 4 or January 22 — *functionally*, all three of those days were the same.  Further, there is nothing absurd about treating January 23 differently than January 22.  There were no Senators who owed attendance in the Senate chamber on January 22 but, presumably, 100 Senators owed their attendance on January 23.

consent on January 4, 2012 than it was on January 3, 2012. And the President would not be able thwart the Senate, as President Roosevelt did, by making well over a hundred recess appointments during a fictional intersession recess of infinitesimal duration.

## III. CONCLUSION

Defining the executive role in our system of checks and balances is one of the most challenging problems of our republic and, consequently, not so easily resolved. The inclusion of intrasession recesses in the ambit of the Recess Appointments Clause is the interpretation most faithful to the text of the Constitution, the intent of the Framers, the purpose of recess appointments, and the tradition and practice of both the President and the Senate. It is for this reason that the Majority cannot articulate a constitutional impediment to the inclusion of intrasession recesses, or make a constitutional case for the categorical exclusion of all intrasession recesses. Interpreting "the Recess" to include intrasession recesses best maintains the balance of power integral to preserving the appointments process intended by the Framers.